# IN THE SUPREME COURT OF TEXAS

══════════════
No. 11-0447
══════════════

LEE C. RITCHIE, ET AL., PETITIONER,

v.

ANN CALDWELL RUPE, AS TRUSTEE FOR THE DALLAS GORDON RUPE, III 1995
FAMILY TRUST, RESPONDENT

══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS
══════════════════════════════════════════════════════

JUSTICE GUZMAN, joined by joined by JUSTICE WILLETT and JUSTICE BROWN, dissenting.

Thirty-seven states, including Texas, have statutes allowing a court to appoint some form of receiver over a closely held corporation for shareholder oppression. Today, Texas becomes the first of these jurisdictions with a statute that unequivocally prefers lesser remedies to effectively preclude those remedies—despite overwhelming authority observing that, to the contrary, many if not all jurisdictions allow these lesser remedies.[1] But even jurisdictions with statutes that are silent on lesser remedies have interpreted their statutes to impliedly allow them. This departure from the plain language of the statute negates protections the law and Texas courts of appeals have long afforded to minority shareholders.[2]

---

[1] *See infra* Part II.A.

[2] *See infra* Part II.A.

Historically, legislatures have recognized that minority shareholders are particularly vulnerable to abuse by majority shareholders and are thus entitled to significant protections. Without protection, shareholder oppression can significantly devalue or destroy the minority shareholder's investment.[3] As one colloquial anecdote declares, "'[t]here are 51 shares . . . that are worth $250,000. There are 49 shares that are not worth a ___.'"[4] Over half a century ago, when Texas enacted its shareholder oppression statute, we warned that "[a] minority stock interest is far from 'change left on the counter.'"[5] Ignoring our prescient observation, the Court today largely relegates minority stock interests to the "change left on the counter" we feared they might become. This radical departure from settled precedents and expectations is primarily the result of the Court effectively rewriting the statute to abolish the lesser remedies the statute prefers as well as the Court's strict definition of oppression that will render any recovery highly unlikely. The Court today defines oppression as a decision that harms the corporation and was not determined in the honest exercise of business judgment. But typical acts of minority shareholder oppression (refusing to pay dividends, paying majority shareholders outside the dividend process, and making fire-sale buyout

---

[3] The investment of minority shareholders in closely held corporations is crucial because of the key role closely held corporations play in the American economy. According to Forbes, America's 224 largest privately held companies alone accounted for $1.61 trillion in revenue and over 4.5 million jobs in 2013. Andrea Murphy & Scott DeCarlo, *America's Largest Private Companies 2013*, FORBES (Dec. 18, 2013), http://www.forbes.com/sites/andreamurphy/2013/12/18/americas-largest-private-companies-2013/. Closely held corporations are a significant category of private companies, which include such organizations as partnerships and sole proprietorships.

[4] Charles W. Murdock, *The Evolution of Effective Remedies for Minority Shareholders and Its Impact Upon Valuation of Minority Shares*, 65 NOTRE DAME L. REV. 425, 425 (1990) (quoting *Humphrys v. Winous Co.*, 133 N.E.2d 780, 783 (Ohio 1956)).

[5] *Patton v. Nicholas*, 279 S.W.2d 848, 854 (Tex. 1955).

offers) usually operate to benefit the corporation and hardly ever harm it.[6] The ultimate effect of this holding is to negate the very foundations of protection the legislatures and U.S. courts have long afforded to minority shareholders in closely held corporations.

Here, the minority shareholder prevailed on her oppression and fiduciary duty claims at trial by presenting legally sufficient evidence that the majority shareholders and corporation made bargain offers to buyout her stock, warned her that it would be the only purchaser of her stock, withheld corporate information from her, refused to meet with prospective purchasers of her shares, and paid personal expenses of a majority shareholder with corporate funds. Indeed, the chairman of the corporation's board of directors admitted at trial that refusing to meet with prospective purchasers was oppressive. Because the Court extinguishes meaningful protections for minority shareholders and renders a take nothing judgment on a valid shareholder oppression claim, I respectfully dissent.

## I. Background

The structure of closely held corporations situates minority shareholders in positions uniquely vulnerable to abuse. *Hollis v. Hill*, 232 F.3d 460, 467 (5th Cir. 2000). Typically, a board of directors elected by a majority of the voting interest of the shareholders oversees the corporation, which operates through officers that report to the board. TEX. BUS. ORGS. CODE §§ 3.103(b), 21.401(a). Generally, these minority shareholders have no right to participate in the management of the corporation, and the directors often elect themselves as officers of the corporation. As an

---

[6] *See, e.g.*, Amicus Letter of Robert A. Ragazzo, Marc. I. Steinberg, Alan R. Bromberg, Joseph K. Leahy, Bruce A. McGovern, Gary S. Rosin, & David Simon Sokolow at 4–5, *Ritchie v. Rupe*, No. 11-0447, Supreme Court of Texas, Jan. 15, 2013; *Patton*, 279 S.W.2d at 853 (finding no evidence of damage to a corporation when majority shareholder refused to pay dividends to minority shareholder).

amicus brief submitted by several professors and faculty of Texas law schools[7] demonstrates, the majority shareholders have the power to freeze out the minority shareholders by denying them employment and failing to pay dividends.[8] The majority shareholders can magnify the economic impact of the freeze out scheme by using corporate funds to personally benefit themselves and denying the minority shareholders access to corporate information—conduct commonly referred to as a "freeze out."[9] And the majority shareholders can ultimately offer to redeem the minority shareholder's stock at a bargain price[10]—often referred to as a "squeeze out."

Unlike minority shareholders in partnerships or public corporations, minority shareholders in closely held corporations are uniquely subject to this oppressive conduct because of their inability to freely exit the venture. In a partnership, a minority shareholder has a statutory right to withdraw from the partnership and receive either her share of the proceeds if the remaining partners terminate the partnership or a fair value buyout of her shares if the remaining partners continue the partnership. TEX. BUS. ORGS. CODE §§ 152.501(b)(1), 152.601(1). Likewise, dissatisfied minority shareholders in a publicly held corporation may sell their shares on the open market. But there is no statutory right for a minority shareholder to exit the corporation and receive a return of her investment. And frequently, the only buyers for minority shares of a closely held corporation are the remaining

---

[7] Ragazzo, *supra* note 6.

[8] *Id.* at 4–5.

[9] *Id.*

[10] *Id.* at 5.

shareholders—who might be engaging in the oppressive conduct from which they could ultimately profit.

Ideally, minority shareholders would reach buy-sell or shareholder agreements with the majority shareholders before purchasing minority shares. When disputes arise, shareholders could readily turn to their agreements as the basis for their rights without needing to resort to the law to determine the duties owed. But as one commentator has observed, "[f]rom a relational standpoint, people enter closely-held businesses in the same manner as they enter marriage: optimistically and ill-prepared."[11] This case exposes the heightened vulnerability to oppression minority shareholders face: the minority shareholder inherited her shares from her husband, who acquired his shares as a member of a family owned business that foresaw no need for shareholder agreements.

Giving due consideration to the plight of minority shareholders, thirty-one states have statutes that permit even the harsh remedy of allowing courts to appoint a receiver to liquidate a corporation based on shareholder oppression.[12] Another four states allow liquidation for "persistent unfairness"

---

[11] Murdock, *supra* note 4, at 426; *see also* Douglas K. Moll, *Minority Oppression & the Limited Liability Company: Learning (or Not) from Close Corporation History*, 40 WAKE FOREST L. REV. 883, 912 (2005) ("Because close corporation owners are frequently linked by family or other personal relationships, there is often an initial atmosphere of mutual trust that diminishes the sense that contractual protection is needed. Commentators have also argued that close corporation owners are often unsophisticated in business and legal matters such that the need for contractual protection is rarely recognized." (internal citations omitted)).

[12] ALA. CODE § 10-2A-1430; ARK. CODE § 4-27-1430; COLO. REV. STAT. § 7-114-301; CONN. GEN. STAT. § 33-896; GA. CODE § 14-2-940; IDAHO CODE § 30-1-1430; 805 ILL. COMP. STAT. 5/12.55; IOWA CODE § 490.1430; MD. CODE, CORPS. & ASS'NS § 3-413; MICH. COMP. LAWS § 450.1489; MISS. CODE § 79-4-14.30; MO. ANN. STAT. § 351.494; MONT. CODE § 35-1-938; NEB. REV. STAT. § 21-2985; N.H. REV. STAT. § 293-A:14.30; N.J. STAT. § 14A:12-7; N.M. STAT. § 53-16-16; N.Y. BUS. CORP. LAW § 1104-a; OR. REV. STAT. § 60.661; 15 PA. STAT. § 1981; R.I. GEN. LAWS § 7-1.2-1314; S.C. CODE § 33-14-300; S.D. CODIFIED LAWS § 47-1A-1430; TENN. CODE § 48-24-301; UTAH CODE § 16-10a-1430; VT. STAT. tit. 11A, § 14.30; VA. CODE § 13.1-747; WASH. REV. CODE § 23B.14.300; W. VA. CODE § 31D-14-1430; WIS. STAT. § 180.1430; WYO. STAT. § 17-16-1430.

or "unfairly prejudicial" conduct.[13]   One state has broader language for when dissolution is appropriate.[14]   Thus, thirty-six states in all appear to allow liquidation for oppressive or similar conduct.[15]   *See also* DOUGLAS K. MOLL & ROBERT A. RAGAZZO, THE LAW OF CLOSELY HELD CORPORATIONS Fig. 7.1 (2012); Robert B. Thompson, *The Shareholder's Cause of Action for Oppression*, 48 BUS. LAW. 699, 709 n.70 (1993).

Here, Ann married into the Rupe family.  Her husband's sister, Paula Dennard, informed Rupe that she would "never get any money in this family."  Rupe and her husband, Buddy, wanted to add their son as a beneficiary to the family trust that owned 47% of Rupe Investment Corporation (RIC),[16] but Dennard and her children refused.  When Buddy passed away, Rupe acquired (together with her son)[17] an 18% interest in RIC.[18]  Rupe claims that Dennard and her colleagues Lee Ritchie

---

[13] ALASKA STAT. § 10.06.628; CAL. CORP. CODE § 1800; MINN. STAT. § 302A.751; N.D. CENT. CODE § 10-19.1-115.

[14] *See* N.C. GEN. STAT. § 55-14-30(2)(ii) (authorizing liquidation if "reasonably necessary for the protection of the rights or interests of the complaining shareholder").

[15] Several states also impose special fiduciary duties on majority shareholders in closely held corporations. *See, e.g.*, *Barth v. Barth*, 659 N.E.2d 559, 561 n.6 (Ind. 1995); *Crosby v. Beam*, 548 N.E.2d 217, 221 (Ohio 1989); *Wilkes v. Springside Nursing Home, Inc.*, 353 N.E.2d 657, 663 (Mass. 1976).  Fiduciary duty protections are discussed in Part II.E, *infra*.

[16] The father of Buddy Rupe and Paula Dennard established the family trust to benefit his wife, his two children (Buddy and Dennard), and Dennard's three children.  At the time, Buddy had one adopted child.  The father did not wish to leave voting shares to an adopted child and believed Buddy to be incapable of having children.  Accordingly, the family trust provided that Buddy's inheritance of RIC dividends would revert to Dennard and her three children on Buddy's death.

[17] Almost all of RIC's voting shares were owned by trusts, including the 18% of the voting shares attributable to Rupe and her son.  For ease of reference, this opinion will refer to the beneficial interest owners of the trust when possible.

[18] In accordance with the terms of the family trust, *see supra* note 16, Buddy's RIC dividends of $50,000 per year from his shares in the family trust reverted to Dennard and her children.

(a descendant of one of RIC's early owners) and Dennis Lutes (an attorney for RIC and Dennard's family) feared she would sue to reform the trust and add her and Buddy's son as a beneficiary. Dennard serves as chair of RIC's board of directors, and with her children controls over 70% of RIC's voting stock. Ritchie serves as RIC's president, is on the board, and together with his family owns just under 10% of RIC's voting stock. And Lutes serves as vice-president and secretary of RIC and is on the board. Together, Dennard and her children, Ritchie and his family, and Lutes control approximately 79% of RIC's voting shares and three of the board's four positions. The trial court found that Dennard, Ritchie, and Lutes voted the same for every shareholder vote for the entire time relevant to this lawsuit. Before his death, Buddy was RIC's fourth director. RIC's sales were approximately $152 million by 2007.

After Buddy's death, Ritchie offered to appoint Rupe to RIC's board if she would agree to not sue another stockholder of RIC, which included the trust. Rupe accepted. Subsequently, when her home was facing foreclosure and she encountered a tax problem, Rupe asked if RIC would purchase her shares. Ritchie responded that RIC would prefer to delay any offer to purchase her shares because one of its subsidiaries was attempting to obtain new financing.

Lutes later offered to redeem Rupe's shares for $1 million. Rupe replied that the $1 million buyout offer was "absurd" and was designed to take advantage of her. Dennard, Ritchie, and Lutes then elected Dennard's daughter Gretchen to take Buddy's seat on the board.

Ritchie later offered for RIC to purchase Rupe's shares for approximately $1.7 million (or $5,987 per share) to be paid over a seven-year period. In making the offer, Ritchie warned that RIC would be the only purchaser of her stock. Ritchie admitted at trial this value was calculated using

the book value of RIC's shareholder equity, and Ritchie and Lutes both conceded that book value was not necessarily representative of market value.[19] RIC's calculation also deducted 50% of the book value of one of its major subsidiaries,[20] and further reduced the value of Rupe's stock by 46.3%.[21] Ritchie separately informed Dennard that based on the same date he valued Rupe's shares at $5,987 per share, Dennard's shares possessed a book value of $7,032 per share for gift tax purposes. And these offers to purchase Rupe's shares were markedly lower than the per-share prices RIC paid to previous minority shareholders.

Unsatisfied with the offer, Rupe retained investment banker George Stasen to market her stock to third parties. When they met, Dennard, several of her children, and Ritchie greeted Stasen in "a very hostile fashion," and Ritchie refused Stasen's request to meet with any potential third-party buyers. They required Rupe and any potential buyer to execute confidentiality agreements that were not subject to negotiation and that granted RIC sole discretion to approve or disapprove disclosure of requested information.

According to Stasen, potential buyers laughed at him because they could not be expected to "make a decision on an investment from this limited information without meeting the executives" of a closely held corporation like RIC. Stasen explained that "[t]here was no way I could ever sell anything . . . [b]ecause there wasn't enough information in the package and everybody wanted to be

---

[19] For example, RIC listed an office building for sale for $1.8 million but established its book value at $124,000 due to depreciation.

[20] RIC subsidiary Hutton Communications was in a financial crisis, but Hutton's chief financial officer testified that its turnaround began before the date on which RIC assessed the book value of Rupe's shares.

[21] RIC used this particular discount when buying back certain stock in previous years.

able to meet Lee Ritchie and talk to the executives of the companies." Importantly Dennard admitted at trial that she disagreed with Ritchie's refusal to meet with potential third-party buyers, she would want to meet with the president of a closely held corporation before investing, Stasen's request of Ritchie was reasonable, and refusing such a request would be "oppressive to a minority shareholder."

Rupe sued Dennard, Ritchie, Lutes, and RIC, claiming shareholder oppression and breach of fiduciary duty. Rupe sought a court-ordered buyout of her shares or, alternatively, the appointment of a receiver to liquidate RIC. Among other things, the jury found after an eight-day trial that: (1) Dennard, Ritchie, Lutes, and RIC engaged in oppressive conduct; (2) RIC failed to allow Rupe to inspect and copy relevant books and records; (3) Dennard paid personal expenses from RIC's corporate funds; (4) Dennard, Ritchie, and Lutes offered Rupe a position on the board if she would agree to not sue a shareholder of RIC; (5) Dennard, Ritchie, and Lutes engaged in oppressive conduct in their redemption offers and treatment of Rupe with regard to inspection and copying of corporate records; (6) Dennard, Ritchie, and Lutes breached their fiduciary duties to Rupe; and (7) the fair value of Rupe's shares was $7.3 million.[22] The trial court entered judgment in favor of Rupe and ordered Dennard, Ritchie, and Lutes to cause RIC to redeem Rupe's shares for $7.3 million. The court of appeals agreed that the conduct amounted to shareholder oppression and a stock buyout was the most appropriate remedy but remanded for a redetermination of the stock's value in light of the lack of marketability and control. 339 S.W.3d 275, 299, 302.

---

[22] RIC's $1.7 million offer was calculated utilizing a valuation date of June 30, 2003. The jury assessed the value of Rupe's shares as of June 30, 2006. The court of appeals affirmed the jury's valuation date, which is not at issue in this appeal.

## II. Discussion

The Court today holds that because the shareholder oppression statute only expressly addresses the remedy of receivership, no other remedy for oppression is available. And because the remedy of receivership is comparably harsh, the Court imposes a stringent definition of oppression by incorporating the business judgment rule. The Court's logic in applying the business judgment rule in this context would presumably also apply to minority shareholder claims for breach of fiduciary duty. But the Court's initial holding that receivership is the only remedy for oppression is flawed—which necessarily affects the soundness of the Court's remaining holdings.

The shareholder oppression statute *not only* addresses but also *prefers* lesser legal and equitable remedies than receivership—it does not extinguish them. Because courts may impose lesser remedies, the long-standing definition of oppression that has existed at common law in Texas and a host of other jurisdictions (to which the Legislature has acquiesced) should apply. Further, the business judgment rule is fundamentally incongruent with the concept of minority shareholder oppression because that oppression (such as buying minority shares for a bargain price) typically benefits the corporation. And the oppression statute contemplates use of lesser remedies in situations where oppression exists but does not harm the corporation—further indicating the business judgment rule should not apply. Neither does the business judgment rule have a place in minority shareholder claims for breach of fiduciary duty. I address each point in turn.

### A. Remedy

At the heart of this case is the pre-codified version of the Texas oppression statute, former article 7.05. That provision requires a shareholder seeking a rehabilitative receivership to establish

that the directors' acts are "illegal, oppressive, or fraudulent." Act of Mar. 30, 1955, 54th Leg., R.S., ch. 64, art. 7.05(A)(1), 1955 Tex. Gen. Laws 239, 290-91, *amended by* Act of May 3, 1961, 57th Leg., R.S., ch. 169, 1, 1961 Tex. Gen. Laws 319, 319 (hereinafter "former art. 7.05"). Additionally, a court may only appoint a receiver: (1) when the court deems it necessary "to conserve the assets and business of the corporation and to avoid damage to parties at interest," and (2) if "all other requirements of law are complied with" and "all other remedies available either at law or in equity, including the appointment of a receiver for specific assets of the corporation, are determined by the court to be inadequate." Former art. 7.05. In short, a court may appoint a receiver when: (1) the directors engage in oppressive conduct; (2) such conduct harms the corporation; and (3) lesser legal and equitable remedies will not suffice.

But the plain language of the oppression statute *prefers* other remedies—it does not extinguish them. Former article 7.05 provides for receivership only if "all other remedies available either at law or in equity . . . are determined by the court to be inadequate." Former art. 7.05. If no other remedies are available under the statute or common law, as the Court holds, the oppression statute would have no need to express a preference for their use. Such a holding violates our fundamental canon of construction to not render any statutory language meaningless. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous."). And in doing so, the Court defeats the very purpose of the Legislature's carefully chosen words.

Other jurisdictions with similar oppression statutes have uniformly interpreted them as allowing other lesser remedies. The Texas oppression statute has its roots in the Illinois Business

11

Corporation Act of 1933,[23] which formed the basis for the Model Business Corporation Act.[24] Courts in states with oppression statutes similar to ours have discussed eight legal and equitable remedies less drastic than a rehabilitative receivership: (1) appointment of a fiscal agent to periodically report to the court; (2) retention of jurisdiction by the court; (3) an accounting of allegedly misappropriated funds; (4) an injunction for oppressive conduct (such as reducing excessive salaries or bonuses); (5) ordering a dividend; (6) ordering a buyout; (7) permitting minority shareholders to purchase additional stock; and (8) awarding damages caused by oppressive conduct. *See, e.g.*, *Baker v. Commercial Body Builders, Inc.*, 507 P.2d 387, 395–96 (Or. 1973); *Fix v. Fix Material Co., Inc.*, 538 S.W.2d 351, 357 n.3 (Mo. Ct. App. 1976). Ironically, the courts that have recognized these remedies attribute the creation of two of them (continuing the exercise of jurisdiction and ordering a dividend) to this very Court—even though the Court extinguishes them today. *See Baker*, 507 P.2d at 395–96 (citing *Patton v. Nicholas*, 279 S.W.2d 848 (Tex. 1955)); *Fix*, 538 S.W.2d at 357 n.3 (same).

Several courts with statutes similar to ours have specifically addressed the propriety of a buyout as a remedy for oppression.[25] Unsurprisingly, the seminal Texas case on the issue has likewise agreed with this authority in recognizing the availability of a buyout under our oppression

---

[23] *Cent. Standard Life Ins. Co. v. Davis*, 141 N.E.2d 45, 49 (Ill. 1957) ("The concept of oppressive conduct as a ground for dissolution of a corporation in equity appears for the first time in the 1933 act.").

[24] Murdock, *supra* note 4, at 455.

[25] *See Balvik v. Sylvester*, 411 N.W.2d 383, 389 (N.D. 1987); *Delaney v. Georgia-Pacific Corp.*, 564 P.2d 277, 288 (Or. 1977) ("[T]his is an appropriate cause for relief in the form of a requirement that [the majority shareholder] purchase plaintiffs' stock at a fair price."). Oregon has since amended its statute to expressly allow buyouts and other remedies, noting that the listed remedies "shall not be exclusive of other legal and equitable remedies that the court may impose." OR. REV. STAT. § 60.952(2)–(3).

statute that expresses a preference for the use of lesser legal and equitable remedies. *Davis v. Sheerin*, 754 S.W.2d 375, 380 (Tex. App.—Houston [1st Dist.] 1988, writ denied) ("Texas courts, under their general equity power, may decree a [buyout] in an appropriate case . . . ."). Texas courts of appeals have agreed.[26] And several courts in other jurisdictions whose oppression statutes address no remedy other than dissolution have found buyouts to be appropriate remedies for oppression.[27]

Importantly, I am aware of no state that has interpreted their shareholder oppression statute as foreclosing all remedies except receivership, as the Court does today. Indeed, other state supreme courts have cited this Court's precedent for the proposition that "[m]ost states have adopted the view that a dissolution statute does not provide the exclusive remedy for injured shareholders and that the courts have equitable powers to fashion appropriate remedies where the majority shareholders have breached their fiduciary duty to the minority by engaging in oppressive conduct."[28]

---

[26] *See, e.g.*, *Christians v. Stafford*, No. 14-99-00038-CV, 2000 WL 1591000, at *2 (Tex. App.—Houston [14th Dist.] Oct. 26, 2000, no pet.) (mem. op.) ("[A] court may order an equitable 'buy-out' of a party's minority shares for oppressive acts of the majority when the party sues both individually in his own right and as a shareholder on behalf of the corporation."); *Advance Marine, Inc. v. Kelley*, No. 01-90-00645-CV, 1991 WL 114463, at *2 (Tex. App.—Houston [1st Dist.] June 27, 1991, no writ) (mem. op.) ("Courts have power to order the equitable remedy of a buy-out by the majority shareholders according to the facts of the particular case."); *see also Balias v. Balias, Inc*, 748 S.W.2d 253, 256–57 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (affirming trial court's denial of appointment of a receiver where shareholder failed to demonstrate that other remedies would have been inadequate).

[27] *See Maddox v. Norman*, 669 P.2d 230, 237 (Mont. 1983) ("[A] court sitting in equity is empowered to determine the questions involved in a case and do complete justice. This includes the power to fashion an equitable result." (citations and quotation marks omitted)); *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 274–75 (Alaska 1980); *McCauley v. Tom McCauley & Son, Inc.*, 724 P.2d 232, 243 (N.M. Ct. App. 1986); *Sauer v. Moffitt*, 363 N.W.2d 269, 274–75 (Iowa Ct. App. 1984).

[28] *Masinter v. WEBCO Co.*, 262 S.E.2d 433, 439–40 (W. Va. 1980) (citing *Patton*, 279 S.W.2d at 853); *see also Rowen v. Le Mars Mut. Ins. Co. of Iowa*, 282 N.W.2d 639, 656 (Iowa 1979) ("Wherever a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation, though no similar relief has been given before." (quotation marks omitted) (citing *Patton*, 279 S.W.2d at 857)).

Commentators are in accord with the host of jurisdictions that recognize courts retain the authority to implement lesser legal and equitable remedies for shareholder oppression. As one commentator has observed, because most oppression statutes are based on the Model Business Corporation Act, "alternative relief, particularly buy-outs of minority shareholders, is available in most, if not all, jurisdictions."[29] And leading scholars on shareholder oppression have observed that buyouts "are the most common remedy for dissension within a close corporation."[30] But ignoring the plain language of the statute and the great weight of authority against its holding, today Texas becomes the first jurisdiction to hold that an oppression statute abolishes the remedies it expressly prefers.

### B. Definition of Oppression

The Court's first misinterpretation of the statute (that there is but one remedy) results in a second: that oppression must have an unduly restrictive definition. The Court observes that receivership is a harsh or drastic remedy, designed for situations that pose a serious threat to the corporation and its shareholders.[31] __ S.W.3d at __; *see also Balias v. Balias*, 748 S.W.2d 253, 257

---

[29] Murdock, *supra* note 4, at 464.

[30] Douglas K. Moll, *Shareholder Oppression and "Fair Value": Of Discounts, Dates, and Dastardly Deeds in the Close Corporation*, 54 DUKE L.J. 293, 309 n.56 (2004) (quoting 1 F. HODGE O'NEAL & ROBERT B. THOMPSON, O'NEAL'S CLOSE CORPORATIONS § 1.16, at 1-97 (3d ed. 2002; *see also id.* at 308–09 ("The most common remedy for oppression . . . is a buyout of the oppressed investor's stockholdings. A buyout is advantageous because it provides a mechanism for an oppressed shareholder to extricate his investment from a venture without having to dissolve the corporation. The majority shareholder continues to operate the close corporation and to participate in the company's successes and failures, while the minority shareholder recovers the value of his invested capital and removes himself from the company's affairs."); Murdock, *supra* note 4, at 470 ("The most common form of alternative remedy is the buy-out of the minority shareholder.").

[31] The remedy of receivership is harsh or drastic when compared to other remedies such as compelling dividends or a buyout because it replaces the shareholders' chosen managers with court-chosen managers. __ S.W.3d at __; *Balias*, 748 S.W.2d at 257. But this does not mean that even a receivership for dissolution will cause the corporation to cease

(Tex. App.—Houston [14th Dist.] 1988, writ denied). The Court has taken a position commentators previously warned against: "the view of dissolution as a 'drastic' remedy generally works to the disadvantage of minority shareholders."[32] Because the Court concludes that receivership is the only remedy under the oppression statute and that it is drastic or harsh, it adopts a novel and strict definition of oppression:

> when [directors or managers] abuse their authority over the corporation with the intent to harm the interests of one or more of the shareholders, in a manner that does not comport with the honest exercise of their business judgment, and by doing so create a serious risk of harm to the corporation.

__ S.W.3d at __. The business judgment rule shields directors and managers from liability for rational decisions made for the benefit of the corporation.[33] If there is no harm to the corporation, the director or manager has not violated the business judgment rule (and might not have violated the rule even if there is harm to the corporation if the decision was made in the honest exercise of business judgment). Thus, the Court's definition of oppression will only allow recovery if a director or manager fails to honestly exercise her business judgment and harms a minority shareholder as well as the corporation itself.

The Texas oppression statute and the court of appeals cases construing it did not develop in a vacuum. The developing body of law in Texas and beyond indicates why the Court's restrictive

---

to be a going concern. The majority shareholders may well purchase the corporation from the receiver, essentially buying out the minority shareholder.

[32] Murdock, *supra* note 4, at 426.

[33] *See Texarkana Coll. Bowl, Inc. v. Phillips*, 408 S.W.2d 537, 539–40 (Tex. Civ. App.—Texarkana 1966, no writ) (holding that a shareholder was not entitled to a remedy for oppression because the directors' decisions were "not inconsistent with the honest exercise of business judgment and discretion").

definition of oppression is unwarranted. Like many other states, Texas's statute was similar to the Model Act.[34] As discussed above, the overwhelming majority of courts have construed their oppression statutes to allow for remedies other than receivership. *See supra* Part II.A. As commentators have observed, "less drastic remedies [than dissolution] may be justified by less oppressive conduct than that required to dissolve a corporation."[35] Accordingly, courts have "almost uniformly taken a broad approach to defining oppressive conduct, and where alternatives to dissolution do not exist by statute, have upheld the general equitable power of the courts to fashion such alternatives. The pattern appears firmly established"—except as of today in Texas.[36]

New York has primarily shaped the definitions of oppression in the United States.[37] The first New York court to squarely address the issue observed that "[w]hether the controlling shareholders discharged petitioner for cause or in their good business judgment is irrelevant;" rather, what was relevant was the minority shareholder's "reasonable expectations." *In re Topper*, 433 N.Y.S.2d 359, 362 (N.Y. Sup. Ct. 1980). The reasonable expectations test for oppression has been further refined

---

[34] The Court believes the Model Act compels its conclusion here because the Act expressly provides a buyout as a remedy. __ S.W.3d at __ n.25. But the Model Act only changed in 1984 to expressly provide a buyout. *Compare* MODEL BUS. CORP. ACT § 14.34 (1984) (establishing procedure for buyout in lieu of dissolution) *with* MODEL BUS. CORP. ACT § 97 (1971) (allowing court to liquidate corporation due to oppressive conduct without specifying other remedies) *and* MODEL BUS. CORP. ACT § 90 (1960) (same). Presciently, the Texas Legislature added in 1955 the flexibility the Model Act did not have until recently by expressly allowing lesser legal and equitable remedies. Former art. 7.05. The Texas Act should not have to expressly enumerate lesser legal and equitable remedies to give the plain statutory language its intended effect.

[35] Murdock, *supra* note 4, at 459.

[36] *Id.* at 470 (citations omitted); *compare favorably McCauley*, 724 P.2d at 236 ("The absence of a rigidly defined standard for determining what constitutes oppressive behavior enables courts to determine, on a case-by-case basis, whether the acts complained of serve to frustrate the legitimate expectations of minority shareholders, or whether the acts are of such severity as to warrant the requested relief.").

[37] Murdock, *supra* note 4, at 465.

as "when the majority's conduct substantially defeats the expectations that objectively viewed were both reasonable under the circumstances and were central to the minority shareholder's decision to join the venture." *Davis*, 754 S.W.2d at 381 (citing *In re Wiedy's Furniture Clearance Ctr. Co.*, 487 N.Y.S.2d 901, 903 (N.Y. App. Div. 1985)).  High courts in Alaska, Iowa, Maryland, Montana, New Jersey, New Mexico, North Carolina, North Dakota, Rhode Island, and Washington have followed New York's lead in adopting the reasonable expectations test.[38]  And this test is firmly established in Texas jurisprudence, with the Amarillo, Corpus Christi, Dallas, El Paso, Fort Worth, Houston (1st and 14th Districts), San Antonio, Texarkana, and Tyler courts of appeals having applied the test in shareholder oppression cases.[39]

But the reasonable expectations test can be a poor fit when the minority shareholder, such as the one here, inherited her shares (perhaps indicating she had no investment expectations at all).[40]

---

[38] *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 674 (Iowa 2013); *Boland v. Boland*, 31 A.3d 529, 542 (Md. 2011); *Scott v. Trans–Sys., Inc.*, 64 P.3d 1, 6 (Wash. 2003); *Hendrick v. Hendrick*, 755 A.2d 784, 791 (R.I. 2000); *Brenner v. Berkowitz*, 634 A.2d 1019, 1028–29 (N.J. 1993); *Balvik*, 411 N.W.2d at 387 (N.D. 1987); *McCauley*, 724 P.2d at 237–38 (N.M. 1986); *Stefano v. Coppock*, 705 P.2d 443, 446 n.3 (Alaska 1985); *Meiselman v. Meiselman*, 307 S.E.2d 551, 563 (N.C. 1983); *Fox v. 7L Bar Ranch Co.*, 645 P.2d 929, 933 (Mont. 1982); *see also Adler v. Tauberg*, 881 A.2d 1267, 1269 (Pa. Super. Ct. 2005)*; Ford v. Ford*, 878 A.2d 894, 904 (Pa. Super. Ct. 2005); *Morrow v. Prestonwold, Inc.*, No. CV000445844S, 2002 WL 652369, at *4 (Conn. Super. Ct. Mar. 22, 2002).

[39] *See, e.g.*, *Kohannim v. Katoli*, __ S.W.3d __, __, 2013 WL 3943078, at *9 (Tex. App.—El Paso July 24, 2013, pet. denied); *Boehringer v. Konkel*, 404 S.W.3d 18, 25 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Argo Data Res. Corp. v. Shagrithaya*, 380 S.W.3d 249, 265 (Tex. App.—Dallas 2012, pet. filed); *In re Trockman*, No. 07-11-0364-CV, 2012 WL 554999, at *2 (Tex. App.—Amarillo Feb. 1, 2012, no pet.) (mem. op.); *Guerra v. Guerra*, No. 04-10-00271-CV, 2011 WL 3715051, at *6 (Tex. App.—San Antonio Aug. 24, 2011, no pet.) (mem. op.); *Gibney v. Culver*, No. 13-06-112-CV, 2008 WL 1822767, at *16–17 (Tex. App.—Corpus Christi Apr. 24, 2008, pet. denied) (mem. op.); *Redmon v. Griffith*, 202 S.W.3d 225, 234 (Tex. App.—Tyler 2006, pet. denied); *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 699–700 (Tex. App.—Fort Worth 2006, pet. denied); *Gonzalez v. Greyhound Lines Inc.*, 181 S.W.3d 386, 392 n.5 (Tex. App.—El Paso 2005, pet. denied); *Willis v. Donnelly*, 118 S.W.3d 10, 32 n.12 (Tex. App.—Houston [14th Dist.] 2003) *aff'd in part and rev'd in part on other grounds*, 199 S.W.3d 262 (Tex. 2006); *Pinnacle Data Servs., Inc. v. Gillen*, 104 S.W.3d 188, 196 (Tex. App.—Texarkana 2003, no pet.).

[40] *See* Ragazzo, *supra* note 6, at 10.

17

Due to such circumstances, New York courts developed a test for finding oppression if the conduct of the majority becomes "burdensome, harsh and wrongful." *Gimpel v. Bolstein*, 477 N.Y.S.2d 1014, 1020 (N.Y. Sup. Ct. 1984). High courts in Maine, Mississippi, Oregon, Rhode Island, and Washington have followed this test,[41] as have the courts of appeals in Texas.[42]

Because of the panoply of legal and equitable remedies Texas and other courts have recognized for oppression, these two definitions of oppression are firmly established in Texas and national jurisprudence and allow courts the flexibility to craft remedies for the varying types of oppression.[43] There is no valid basis to overturn this mountain of jurisprudence, leave Texas out of step with other jurisdictions whose statutes are similar to ours, and chill investment in closely held corporations.

---

[41] *See Napp v. Parks Camp, Ltd.*, 932 A.2d 531, 538 (Me. 2007); *Scott*, 64 P.3d at 6 (Wash. 2003)*; Hendrick*, 755 A.2d at 791 (R.I. 2000); *Kisner v. Coffey*, 418 So.2d 58, 61 (Miss. 1982); *Baker*, 507 P.2d at 393 (Or. 1973); *see also Edenbaum v. Schwarcz-Osztreicherne*, 885 A.2d 365, 378 (Md. Ct. Spec. App. 2005); *Colt v. Mt. Princeton Trout Club, Inc.*, 78 P.3d 1115, 1118 (Colo. App. 2003); *Morrow*, 2002 WL 652369, at *5; *Jorgensen v. Water Works, Inc.*, 582 N.W.2d 98, 107 (Wisc. Ct. App. 1998); *Whale Art Co. v. Docter*, 743 S.W.2d 511, 514 (Mo. Ct. App. 1987)*.*

[42] *See, e.g.*, *Kohannim*, __ S.W.3d at __, 2013 WL 3943078, at *9; *Boehringer*, 404 S.W.3d at 25; *Shagrithaya*, 380 S.W.3d at 265; *Trockman*, 2012 WL 554999, at *2; *Guerra*, 2011 WL 3715051, at *6; *Gibney*, 2008 WL 1822767, at *16–17; *Gonzalez*, 181 S.W.3d at 392 n.5; *Willis*, 118 S.W.3d at 32 n.12; *Gillen*, 104 S.W.3d at 196; *Devji v. Keller*, No. 03-99-00436-CV, 2000 WL 1862819, at *7 (Tex. App.—Austin Dec. 21, 2000, no pet.) (mem. op.); *Davis*, 754 S.W.2d at 382.

[43] The Court holds that the Legislature cannot acquiesce to decisions that run contrary to a statute's plain language and that long-standing Texas court definitions of oppression are thus invalid. __ S.W.3d at __ n.16. The first proposition is unquestionably true, but the Court's application is incorrect. If, as the Court holds, the statutory definition of oppression should be more restrictive than the common-law definition because the statute applies to more than just closely held corporations, then the common-law claim for oppression should fill the "gap" in protection the Court admittedly leaves with its decision.

## C. The Business Judgment Rule

In addition to crafting a restrictive definition of oppression, the Court embeds in its definition the business judgment rule, shielding majority shareholders and directors from liability for decisions that do not harm the corporation or that were made in the honest exercise of business judgment. But the business judgment rule is fundamentally at odds with the lesser shareholder oppression remedies the oppression statute expressly prefers. The Court's inclusion of the rule in the definition of oppression negates the very protection the oppression statute afforded until today.[44]

When crafting the reasonable expectations test for shareholder oppression, the New York court observed that "[w]hether the controlling shareholders discharged petitioner for cause or in their good business judgment is irrelevant." *Topper*, 433 N.Y.S.2d at 362. A number of other courts have likewise rejected the business judgment rule in minority shareholder oppression cases.[45]

Commentators have agreed that the business judgment rule should not apply in shareholder oppression cases. As one leading commentator has explained:

> [T]he shareholder oppression doctrine recognizes that decisions about such matters by a majority-controlled board can be part of a minority shareholder freeze-out. The oppression doctrine, therefore, is implicitly premised upon the notion that close corporation employment, management, and dividend decisions require more than a

---

[44] The Court responds that the business judgment rule is congruent with the portion of the oppression statute, noting that it is "to conserve the property and business of the domestic entity and avoid damage to interested parties." __ S.W.3d at __ n.13. This assessment is misguided for three reasons. First, minority shareholders whose investments are being diminished would seem to qualify as "interested parties." Second, the Court is reading one provision of the statute ("conserve the property and business of the domestic entity") to render two others meaningless ("interested parties" and "all other legal and equitable remedies"). Third, this distortion of the statute leaves a gap in protection under the common law.

[45] *See, e.g., Grato v. Grato*, 639 A.2d 390, 396 (N.J. Super. Ct. App. Div. 1994); *Fox*, 645 P.2d at 934–35 (Mont. 1982); *Smith v. Atl. Props., Inc.*, 422 N.E.2d 798, 801, 804 (Mass. App. Ct. 1981); *Exadaktilos v. Cinnaminson Realty Co.*, 400 A.2d 554, 561 (N.J. Super. Ct. Law Div. 1979).

mere surface inquiry into the majority's conduct. Indeed, the fact that courts applying the oppression doctrine are subjecting the majority's actions to "reasonable expectations" or "burdensome, harsh, and wrongful conduct" standards suggests that courts are requiring majority shareholders to do more than merely articulate a rational business purpose for their decisions.

Douglas K. Moll, *Shareholder Oppression in Texas Close Corporations: Majority Rule Isn't What It Used To Be*, 1 HOUS. BUS. & TAX. L.J. 12, 20 (2001) (citations omitted); *see also* F. Hodge O'Neal, *Close Corporations: Existing Legislation and Recommended Reform*, 33 BUS. LAW. 873, 884 (1978) (criticizing the business judgment rule as a conceptual barrier to judicial relief for aggrieved minority shareholders).

The typical example of minority shareholder oppression culminates when directors offer to buy a minority shareholder's shares at a fraction of their true value. Such an offer will seemingly always be in the corporation's best interest. For example, the directors here offered at most $1.7 million for shares the jury valued at trial at $7.3 million. If this value were the fair market value,[46] the shareholder oppression could benefit the corporation by $5.6 million if the minority shareholder accepted. Likewise, refusing to pay dividends to shareholders strengthens the corporation's cash reserves, paying a director's personal expenses from corporate funds keeps the director satisfied and in continued service of the corporation, and refusing to meet with prospective purchasers prevents statements that might possibly be the basis for a securities fraud suit. Each such act that potentially oppresses a minority shareholder can benefit the corporation and be justified under the business judgment rule. But after today, the business judgment rule will allow essentially all minority

---

[46] As explained below, I agree with the court of appeals that the jury's valuation of the minority shareholder's stock at $7.3 million failed to account for the stock's lack of marketability or control. Thus, the fair market value would be somewhat less than $7.3 million.

shareholder oppression that does not harm the corporation (and even some liability that does harm the corporation if the directors or majority shareholders made an honest business decision).

## D. Common-Law Cause of Action

The Court also determines "the foreseeability, likelihood, and magnitude of harm sustained by minority shareholders due to the abuse of power by those in control of a closely held corporation is significant, and Texas law should ensure that remedies exist to appropriately address such harm when the underlying actions are wrongful." __ S.W.3d at __. But the Court concludes that the common-law standard for minority shareholder oppression is too vague[47] and existing remedies provide adequate protection, thereby obviating the need for a common-law cause of action.

Tellingly, the Court acknowledges that its interpretation of the oppression statute and failure to impose a common-law remedy for oppression "leaves a 'gap' in the protection that the law affords to individual minority shareholders" when the harm to the minority shareholders does not harm the corporation.[48] __ S.W.3d at __. Until today, that gap has not existed because Texas courts have

---

[47] One basis for the Court's conclusion is its belief that the common-law reasonable expectations test is difficult to apply when a minority shareholder inherited her shares. __ S.W.3d at __. But this is precisely why courts in Texas and a host of other jurisdictions apply the test for burdensome, harsh, and wrongful conduct when addressing inherited shares. *See supra* Part II.B.

[48] The Court takes solace in the fact that majority shareholders that harm minority shareholders might also be harming the corporation, thus allowing a rehabilitative receiver under the oppression statute or a breach of fiduciary duty claim if the facts support it. __ S.W.3d at __ n.53. The Court specifically opines that "[r]efusal to pay dividends, paying majority shareholders outside the dividend process, and making fire-sale buyout offers certainly can harm the corporation, for instance, by lowering the value of its stock." *Id.* But such observation reflects a misunderstanding of closely held corporations. For example, refusing to pay dividends to any shareholder yields additional cash reserves. One buying a majority interest in the company would obviously pay more for a company with more cash, which they could extract with the powers associated with their majority interest. One buying a minority interest would not necessarily pay more if they have no legal recourse to compel the majority shareholder to pay a dividend to the minority shareholder (and they have no such recourse after today). Such an example is not difficult to find. It occurred the last time we addressed this issue. In *Patton*, the majority shareholder refused to pay dividends to the minority shareholders, and we held that such conduct did not harm the corporation. 279 S.W.3d at 853.

interpreted the oppression statute to allow lesser remedies for oppression that harms minority shareholders but not the corporation.

No other existing remedy the Court discusses adequately protects minority shareholders from such oppression. The remedy that comes closest to affording some relief to the oppressed minority shareholder is a common-law claim for breach of fiduciary duty. But the Court's logic expressly and impliedly negates such a claim. Expressly, the Court observes that we recognized this cause of action in *Patton* and treated it as a derivative action. __ S.W.3d at __. But a shareholder only has standing to bring a derivative action if she fairly and adequately represents the interests of the corporation.[49] TEX. BUS. ORGS. CODE § 21.552(2). Thus, a derivative action would only lie in this context when the oppression of the minority shareholder harms the corporation itself. The Court espouses this principle by observing that "actions that are 'oppressive' under the statute ordinarily will not give rise to derivative suits." __ S.W.3d at __ n.15. But in *Patton*, we recognized that the majority shareholder's misconduct did not harm the corporation itself but nonetheless allowed the minority shareholder's claim for breach of fiduciary duty. 279 S.W.2d at 853 ("[W]e find no evidence . . . that [the corporation] was damaged."). Thus, if the Court is correct today and minority shareholders may only bring fiduciary duty claims for the benefit of the corporation, *Patton* is wrong.[50] But, *Patton* is not wrong; it correctly allowed a minority shareholder claim for breach of

---

[49] The Court observes that shareholders in closely held corporations that elect to be close corporations do not have to fairly and adequately represent the interests of the corporation. __ S.W.3d at __; TEX. BUS. ORGS. CODE § 21.552. But this offers no remedy for minority shareholders in corporations like RIC that have not elected close corporation status.

[50] The Court also notes that the Business Organizations Code allows courts to treat a closely held corporation's shareholder claim as direct rather than derivative. __ S.W.3d at __; TEX. BUS. ORGS. CODE § 21.563(c). But because the Court interprets the oppression statute to only allow a remedy if the corporation itself is harmed, treating derivative

fiduciary duty even when there was no harm to the corporation.[51]  279 S.W.2d at 853.  *Patton* did

not require a derivative claim.

The Court's logic also impliedly restricts fiduciary duty claims.  As addressed below, the

Court's conclusion that the business judgment rule should apply to statutory shareholder oppression

claims would seem to apply with equal force to fiduciary duty claims.  *See infra* Part II.E.  But the

rule is fundamentally at odds with the remedy of the fiduciary duty claim, just as it is at odds with

shareholder oppression claims.  *See supra* Part II.C.  In short, the Court acknowledges that its unduly

restrictive interpretation of the oppression statute leaves minority shareholders unprotected from

conduct that will harm them but not the corporation.  It is precisely the Court's restrictive view of

the statute that creates the gap in protection and requires a common-law cause of action.

### E. Breach of Fiduciary Duty

Shareholder oppression was not the only cause of action in this proceeding.  Rupe also sued

for breach of fiduciary duty.

Like shareholder oppression, breach of fiduciary duty is a doctrine that protects minority

shareholders from abuse and oppression.  As one leading commentator has observed:

> The development of the statutory cause of action and the enhanced fiduciary duty
> reflect the same underlying concerns for the position of minority shareholders,
> particularly in close corporations after harmony no longer reigns.  Because of the

actions as direct actions offers no meaningful protection to the oppressed minority shareholder.

[51] The Court mischaracterizes *Patton* as standing for the proposition that an improper refusal to declare dividends entitled minority shareholders to relief "either directly to the corporation or through a derivative action." __ S.W.3d at __.  But we found no harm to the corporation in *Patton* and required the majority shareholder to declare reasonable dividends for up to five years.  279 S.W.2d at 857–58.  We required declaring dividends to benefit the shareholders (which had been harmed) rather than the corporation (which had not been harmed by withholding dividends).

23

similarities between the two remedial schemes . . . it makes sense to think of them as two manifestations of a minority shareholder's cause of action for oppression [or] as two sides of the same coin . . . .

Douglas K. Moll, *Shareholder Oppression & Dividend Policy in the Close Corporation*, 60 WASH. & LEE L. REV. 841, 852 (2003) (quotation marks and citations omitted). The fiduciary concept for close corporations arose in the 1970s, when the Massachusetts high court recognized that "stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." *Donahue v. Rodd Electrotype Co.*, 328 N.E.2d 505, 515 (Mass. 1975).

As the Fifth Circuit has observed, this "recognition of special rules of fiduciary duty applicable to close corporations has gained widespread acceptance." *Hollis*, 232 F.3d at 468. High courts in Indiana, Maryland, Minnesota, New York, Ohio, Utah, and West Virginia have recognized that majority shareholders can owe fiduciary duties to minority shareholders.[52]

We expressly avoided the issue in *Willis v. Donnelly* because the record there could not support the existence of a fiduciary duty. 199 S.W.3d 262, 276–77 (Tex. 2006). But we did recognize the existence of a fiduciary duty in *Patton*, where we held that "[u]ndoubtedly the malicious suppression of dividends is a wrong akin to breach of trust, for which the courts will afford a remedy." 279 S.W.2d at 854. In light of *Patton* and the mainstream approach in American

---

[52] *See Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1001 (N.Y. 2011); *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 381 (Minn. 2011); *McLaughlin v. Schenck*, 220 P.3d 146, 155 (Utah 2009); *Barth*, 659 N.E.2d at 561 n.6 (Ind. 1995); *Crosby*, 548 N.E.2d at 221 (Ohio 1989); *Toner v. Balt. Envelope Co.*, 498 A.2d 642, 648 (Md. 1985); *Masinter*, 262 S.E.2d at 438 (W. Va. 1980); *see also D & J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 206 (5th Cir. 2010) (applying Connecticut law); *Fiederlein v. Boutselis*, 952 N.E.2d 847, 860 (Ind. Ct. App. 2011); *Walta v. Gallegos Law Firm, P.C.*, 40 P.3d 449, 456–57 (N.M. Ct. App. 2001); *Lazenby v. Godwin*, 253 S.E.2d 489, 492 (N.C. Ct. App. 1979).

jurisprudence, Texas courts of appeals have determined on a case-by-case basis whether majority shareholders owe an informal fiduciary duty to minority shareholders of closely held corporations.[53] A key factor weighing in favor of a fiduciary duty is the extent to which the majority shareholders dominate control over a closely held corporation. *Redmon v. Griffith*, 202 S.W.3d 225, 237 (Tex. App.—Tyler 2006, pet. denied).

Finally, the business judgment rule should not apply to these fiduciary duty claims. When we recognized a claim for breach of fiduciary duty in *Patton*, the majority shareholder was harming the minority shareholders but not the corporation itself, and we compelled a dividend to be paid to the minority shareholders. 279 S.W.2d at 853, 857. Had the business judgment rule applied, we could not have compelled a dividend because there was no harm to the corporation.

## F. Application

## 1. Oppression

Rupe prevailed at trial on her shareholder oppression and fiduciary duty claims, and the trial court compelled a $7.3 million buyout. The court of appeals held there was sufficient evidence of shareholder oppression (and therefore did not reach the fiduciary duty issues), but the $7.3 million buyout failed to account for the minority shares' lack of marketability and control. 339 S.W.3d at 302. The jury charge defined oppression as:

> burdensome, harsh and wrongful conduct, a lack of probity and fair dealing in the affairs of the company to the prejudice of some of its members, or a visible departure

---

[53] *See, e.g.*, *Redmon*, 202 S.W.3d at 237; *Willis*, 118 S.W.3d at 31; *Pabich v. Kellar*, 71 S.W.3d 500, 504–05 (Tex. App.—Fort Worth 2002, pet. denied); *Hoggett v. Brown*, 971 S.W.2d 472, 487–88 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *Fisher v. Yates*, 953 S.W.2d 370, 378–79 (Tex. App.—Texarkana 1997, pet. denied); *Gaither v. Moody*, 528 S.W.2d 875, 877 (Tex. Civ. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.).

from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts her money to a company is entitled to rely.

As previously addressed, this definition is more appropriate here than the reasonable expectations definition because Rupe inherited her shares and thus had no expectations when making a decision to invest.

The jury found that Dennard, Ritchie, Lutes, and RIC all engaged in oppressive conduct. The jury also affirmatively answered special submissions that: (1) Dennard paid personal expenses from RIC corporate funds; (2) Dennard, Ritchie, and Lutes offered Rupe a position on the board in exchange for her agreement not to sue a shareholder of RIC; (3) Dennard, Ritchie, and Lutes's buyout offers were oppressive; (4) Dennard, Ritchie, and Lutes's failure to permit Rupe to examine and copy corporate information was oppressive; (5) Dennard, Ritchie, and Lutes owed Rupe a fiduciary duty; (6) Dennard, Ritchie, and Lutes breached their fiduciary duty; and (7) the fair value of Rupe's shares was $7.3 million, not discounted for lack of marketability or control. The trial court entered judgment that compelled a buyout of Rupe's shares for $7.3 million.

Before assessing whether sufficient evidence supports the verdict, one must assess whether the submission was proper. In addition to submitting a broad-form question on oppression,[54] the trial court asked the jury to resolve disputed facts. This submission was proper. If equitable remedies still exist (and the statute specifies they should), the trial court must know what conduct constitutes oppression in order to fashion the least harsh remedy requested to rectify that oppression. For example, if a majority shareholder either refused to pay dividends or issued a bargain buyout offer

---

[54] Specifically, the jury was asked: "Do you find that the Defendants engaged in oppressive conduct to the rights of [Rupe] as a shareholder in Rupe Investment Corporation?"

26

and the jury simply answered "yes" to the broad-form question, the trial court sitting in equity would not know whether to compel a dividend or a buyout. Because the oppression statute expressly prefers equitable remedies, I believe the trial court's submission of special issues to the jury here was appropriate.

Having determined the trial court's submission was proper, I also believe there is legally sufficient evidence supporting the findings of oppression. Because Rupe inherited her shares, oppression is defined as burdensome, harsh, or wrongful conduct.[55] There is evidence of the following conduct the jury found to be oppressive: (1) making inferior offers of $1 million and $1.7 million; (2) warning Rupe that RIC would be the only purchaser of her stock; (3) refusing to meet with prospective purchasers of Rupe's shares; and (4) Dennard paying personal expenses from corporate funds.[56] Regarding the offers to purchase, Ritchie testified he thought Rupe was not entitled to a "fair offer." And the $1.7 million valuation reflected discounts beyond those applied to previous redemptions of minority shares. Regarding the refusal to meet with prospective purchasers, Dennard admitted: (1) she disagreed with Ritchie's refusal to meet with prospective purchasers; (2) she would want to meet with the president of a closely held corporation before investing; (3) the request for Ritchie to meet with prospective purchasers was reasonable; and (4) such a refusal would be "oppressive to a minority shareholder." Lutes also agreed that it would be reasonable for Rupe to expect that RIC would help her sell her stock "[t]o the extent possible,"

---

[55] *See supra* notes 40–42 and accompanying text.

[56] Despite never having been an RIC employee, Dennard receives health insurance from RIC, receives $2,500 per month, and receives secretarial assistance at home on a weekly basis to balance her personal checkbook and pay her bills. No minority shareholder receives similar benefits.

and that "[i]t would have been possible" for Ritchie to have met with potential purchasers. Accordingly, there is some evidence to support the jury's findings of oppression.

## 2. Remedy

Having concluded there is legally sufficient evidence of oppression, the question becomes what remedy is appropriate. Rupe primarily requested a buyout and alternatively requested dissolution if the buyout was inadequate. Dissolution is undoubtedly harsher than a buyout. *See* Robert A. Ragazzo, *Toward a Delaware Common Law of Closely Held Corporations*, 77 WASH. U.L.Q. 1099, 1119 (1999) ("[The buyout] is less harsh than dissolution and often gives both parties what they want most."). But the statute does not allow for dissolution based on oppression. Former art. 7.05. Thus, there is no need to compare the harshness of a buyout to a remedy Rupe never requested.[57]

Because I agree with the court of appeals that it was error for the trial court to instruct the jury to not discount the value of Rupe's stock for its lack of marketability or minority status, I would affirm its judgment remanding for a redetermination of the amount of the buyout. 339 S.W.3d at 302. Under Rule of Appellate Procedure 44.1(b), a new trial may be ordered on a separable part of a proceeding, but a separate trial on unliquidated damages is improper if liability is contested. TEX. R. APP. P. 44.1(b). Here, the amount of the buyout is an equitable remedy rather than a measure of

---

[57] The Court observes that the court of appeals did not analyze whether a buyout is less harsh than a rehabilitative receiver. __ S.W.3d at __. But Rupe never requested a rehabilitative receiver. And the court of appeals actually assessed the alleged harshness of the buyout and determined the trial court did not abuse its discretion in light of RIC's $152 million net sales and $55 million in assets. 339 S.W.3d at 298–99. It would seem premature for the court of appeals to fully assess the comparative harshness of a buyout when it remanded for a recalculation of that amount.

unliquidated damages, and a retrial on the amount of the buyout alone is separable without unfairness to the parties.[58]

## III. Conclusion

In sum, I cannot agree that a proper construction of the shareholder oppression statute is that the statute extinguishes the very remedies it expressly prefers. Uniformly, courts in Texas and beyond have held that less harsh remedies at law and equity are available, such as a court-ordered buyout. Under the time-honored definitions of oppression, there is some evidence that the majority shareholders here engaged in burdensome, harsh, and wrongful conduct by (1) making inferior buyout offers; (2) warning Rupe that RIC would be the only purchaser of her stock; (3) withholding corporate information; (4) refusing to meet with prospective purchasers of Rupe's shares; and (5) paying Dennard's personal expenses with corporate funds. RIC's chairman even admitted that refusing to meet with prospective purchasers was oppressive. But because the valuation of Rupe's shares failed to account for their lack of marketability or control, I would affirm the judgment of the court of appeals, which remanded to the trial court for a redetermination of the amount of the buyout. Because the Court renders judgment that Rupe take nothing on her valid shareholder oppression claim, I respectfully dissent.

---

[58] Rupe's alternative basis of relying on the fiduciary duty claim would not affect that remand for a retrial. Assuming a buyout is the appropriate remedy for the breach of fiduciary duty here, the buyout calculation still failed to account for the shares' lack of marketability or control.

_____
Eva M. Guzman
Justice


Opinion Delivered: June 20, 2014