2007 ME 126

**Ann NAPP**

v.

**PARKS CAMP, LTD.**

Supreme Judicial Court of Maine.

Argued: Jan. 18, 2007.
Decided: Sept. 4, 2007.

David M. Lipman, Esq. (orally), James A. Billings, Esq., Lipman, Katz & McKee, P.A., Augusta, for plaintiff.

William D. Hewitt, Esq. (orally), Pierce Atwood LLP, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.*

CLIFFORD, J.

[¶ 1] Ann Napp appeals from a summary judgment entered in the Superior Court (Kennebec County, *Marden, J.*), dismissing her complaint brought pursuant to 13–C M.R.S. § 1430(2)(B) (2006) seeking dissolution of Parks Camp, Ltd., a closely held corporation. Napp contends that there are genuine issues of material fact

with respect to whether the majority shareholders and directors acted illegally, and oppressively, within the meaning of section 1430(2)(B), by acting in contravention of the corporation's articles of incorporation and a shareholder agreement. We affirm that part of the summary judgment arising out of the allegations that shareholders and directors acted illegally. Because there are genuine issues of material fact that remain as to whether the directors and majority shareholders acted oppressively within the meaning of section 1430(2)(B), we vacate that part of the summary judgment.

## I. BACKGROUND

[¶ 2] Viewing the evidence in the light most favorable to Napp as the nonprevailing party, *see Champagne v. Mid–Maine Med. Ctr.*, 1998 ME 87, ¶ 5, 711 A.2d 842, 844, the following facts are supported in the record. In 1988, Marshall Parks conveyed to six of his ten children, as tenants in common, land and buildings along Great Pond in Rome, valued at $500,000. Beginning in December of 1988, the six co-owners conducted annual meetings to discuss issues relating to the property, including operations and maintenance. According to the minutes of the 1990 meeting, "it became apparent that for tax and liability reasons, incorporation was a viable option." The co-owners unanimously agreed to form a corporation for the purpose of managing the family property. The six siblings also unanimously agreed to invite a seventh sibling to be a shareholder in the corporation.

[¶ 3] In April of 1991, the siblings formed a close corporation,[1] Parks Camp

* Justice Howard H. Dana Jr. sat at oral argument and participated in the initial conference but retired before this opinion was certified.

1. A close corporation is defined under the Maine Business Corporation Act as "a corporation that, at any given time, has not more than 20 shareholders of all classes of shares,

Ltd., and executed articles of incorporation, bylaws, and a shareholder agreement. Relevant portions of the articles and shareholder agreement, at issue here, are presented below.

## A. Articles of Incorporation

[¶ 4] According to the articles of incorporation,

[t]he purposes for which the corporation is organized is to acquire, use, own, convey or otherwise dispose of real property; to carry on all other purposes, acts, or businesses for which a corporation may be organized or engaged as may be permitted by law; and to have other powers necessary for or incidental to carrying out any of the foregoing purposes.

Pursuant to the articles, "[t]he stockholders are authorized to increase or decrease the number of directors. The minimum number shall be two (2) directors, and the maximum number shall be ten (10) directors."

[¶ 5] A majority vote is required for any matter submitted to the stockholders for a vote, with the exception of numerous provisions laid out in Article X, which require a unanimous vote. Matters on which a unanimous vote is required include, inter alia:

(a) the increase or decrease of capital or stock or the issuance of debentures;

(b) the amendment or adoption of the articles of incorporation or bylaws applicable to the Company or general business rules applicable to the directors;

. . . .

(g) the borrowing of cash or other property . . .;

. . . .

whether or not the shareholders are entitled

(j) the approval of annual financial statements (including balance sheets and profit and loss statements), the appointment of auditors, the establishment of policies concerning reserves or depreciation, and other material financial policy.

## B. Shareholder Agreement

[¶ 6] The purposes of the shareholder agreement are set out in the prefatory clauses, including: "to regulate the relations among the Company and the Shareholders, and require stockholders' approval of certain transactions which otherwise could be executed by the Board of Directors" and "to enter into an agreement to fix the number of Directors of the Company and to amend its charter and bylaws, if necessary, to implement their agreement." The first part of the agreement, which is not at issue, contains restrictions on the disposition and transfer of the shares of the corporation.

[¶ 7] The second part of the agreement contains provisions regarding the management of the corporation, in the form of both a voting agreement, pursuant to 13–C M.R.S. § 742 (2006), and a shareholder agreement, pursuant to 13–C M.R.S. § 743 (2006). The voting agreement states: "Throughout the term of this Agreement, so long as each remains a Shareholder, each Shareholder shall each be entitled to be elected as a director. At each annual Shareholders meeting, the Shareholders agree to nominate a slate of directors constituting each and all of the Shareholders."

[¶ 8] The shareholder agreement contains provisions identical to those included in the articles of incorporation, stating that neither the board of directors nor the company may take any of the same specifically enumerated actions without "the affirma-

to vote." 13–C M.R.S. § 102(2–A) (2006).

tive vote of ... all of the outstanding common stock of the Company."

[¶ 9] The shareholder agreement also provides for the sale or transfer of stock of the company. A shareholder wishing to sell stock in the company must first offer the stock to the other shareholders, and the purchase price must be for "the fair market value of the s[ ]hares, represented by the average of two independent appraisals of the Company's assets less any liabilities of the Company as of the date of the sale divided by the number of shares offered for sale."

## C. Facts Alleged in the Motion for Summary Judgment

[¶ 10] From 1992 to 2002, the shareholders held annual meetings, but failed to nominate or elect a board of directors as required by the bylaws, making no distinction between actions taken as shareholders and actions taken as directors. In 1995, one shareholder sold her shares back to the corporation for one dollar, which the corporation considered a relinquishment of her shares, even though it was for less than fair market value.

[¶ 11] In 1998, the stockholders unanimously passed a resolution stating that shareholders who received a fair market value cash settlement for their interest in the corporation would not be allowed to stay at the property without paying the corporation the market value for their stay. At a special meeting in March of 2002, an attempt was made to extend this resolution to the children of those who accepted fair market value for their shares, but unanimous approval was not given, with Napp and her brother, Philip Parks, both voting "no."

[¶ 12] The first nomination and vote for a board of directors occurred at the annual shareholders meeting in August of 2002. That initial vote did not result in any shareholder being elected to the board, so another vote was held at a special meeting two weeks later. At the special meeting, four shareholders voted for an interim board, comprised of only two of the shareholders. Only Napp and Philip Parks voted that all shareholders should be on the board, consistent with the shareholders' agreement.

[¶ 13] From August 24, 2002, to February 9, 2003, the two shareholders acted as the sole directors, during which time they purported to adopt a "Code of Ethics," intended to be binding on all shareholders. Relations between the siblings continued to deteriorate, and on October 23, 2002, Napp notified the other shareholders that she was consulting an attorney. All six shareholders were elected to the board at the February 9, 2003, shareholders' meeting. Napp was asked to let the shareholders know whether she would continue to be represented by legal counsel. In March of 2003, two of the shareholders called for Napp's removal as a director, but she was not removed at that time. At the January 2004 annual meeting, however, Napp was not reelected to the board, but instead was nominated to serve as the president of the corporation, a position she declined.

[¶ 14] Napp then notified the shareholders that she was suing the corporation. One of the acting directors then sent correspondence to all shareholders acknowledging that the voting agreement in the shareholders' agreement had been violated due to "erroneous legal advice" and that this should be corrected. The correspondence suggested that the code of ethics be rescinded and sought a vote to do so through a resolution. Napp understood that the resolution, if adopted by the shareholders, would have placed Napp back on the board of directors and would have rescinded the code of ethics. Approximately two weeks later, a special

meeting was held to consider the issues of the composition of the board of directors and the rescission of the code of ethics, but no vote was taken at that time due to then corporate president Philip Parks's opposition to such a vote.

[¶ 15] Pursuant to 13–C M.R.S. § 1430 (2006), Napp filed a complaint against the corporation in the Superior Court seeking dissolution of the corporation, alleging that "[f]rom the events that have occurred, it is clear that the directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal or oppressive" and "it is clear that the business affairs of the corporation can no longer be conducted to the advantage of the shareholders generally."[2]

[¶ 16] After the complaint was filed, the other five directors voted to rent out the camp to pay for legal defense costs, limiting shareholder use of the property, but allowing the "shareholders to use the property either by paying the rental value, or by using it for free on a standby basis when it is not otherwise being rented." In 2004, a majority of the board of directors also voted that all shareholders must pay an annual assessment of $3000, and that by prepaying this assessment the shareholders would have an additional "unit of ownership" if the property is later sold.

[¶ 17] Underlying this suit, and present in the statements of fact, are long-standing family disputes among several of the siblings, both shareholders and nonshareholders alike.

[¶ 18] The court entered summary judgment in favor of Parks Camp, concluding that Napp had failed to present a genuine issue of material fact regarding either illegality or oppression. Following the entry of a summary judgment, Napp filed this appeal.

## II.  DISCUSSION

### A.  Conduct that Occurred After Napp Filed the Complaint

■ [¶ 19] As a preliminary matter, Napp argues that the Superior Court erred by failing to consider evidence of conduct that occurred after the filing of the complaint that she presented in her M.R. Civ. P. 56(h) statement of material facts.  Parks Camp contends that the court correctly declined to consider evidence of the corporate actions that occurred after the complaint was filed because Napp never moved to supplement her complaint pursuant to M.R. Civ. P. 15(d).

[¶ 20] Although the court did not specifically address many of the facts alleged by the parties in its judgment, it stated: "Additional facts that arose after the filing of the complaint over two years ago, a complaint that has not been amended, are not properly before the court (for example, the decision of the corporation to permit shareholders to pre-pay their annual dues occurred in August 2004)."

Maine Rule of Civil Procedure 15(d) states, in full:

> Supplemental Pleadings.  Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented.  Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense.  If the court deems it advisable

---

**2.**  Philip Parks successfully moved to intervene in the suit pursuant to 13–C M.R.S. § 1434(1) (2006).  Philip did not join in Napp's appeal, however.

that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefor.

[¶ 21] Parks Camp relies on our decision in *Steinberg v. Elbthal,* 463 A.2d 731 (Me. 1983), to argue that conduct occurring after Napp filed her complaint cannot be considered. *In Steinberg,* we said that, "[w]hen faced with the need to amend pleadings in response to events which have taken place since the time of the original pleadings, the appropriate procedure is to move to supplement the pleadings pursuant to M.R. Civ. P. 15(d)." *Id.* at 733. *Steinberg* is distinguishable, however, because in that case, the new events that occurred after the complaint was filed were related to a claim for treble damages not pleaded in a counterclaim. *See id.* *Steinberg* is also procedurally distinguishable, both because there was a pretrial order in that case that did not put the parties on notice of a counterclaim for treble damages, and because the appeal arose after there had been a full trial on the issues. *Id.* at 732–33.

[¶ 22] By contrast, in this case, the new events that occurred after the filing of Napp's complaint, including the board's decisions to allow pre-payment of assessments by the shareholders, and to rent the camp to generate funds for the defense of this lawsuit, both fall under the claims originally pleaded: oppression and illegality. A pretrial order has not yet been issued nor has a trial taken place. Accordingly, the factual issues raised in the parties' M.R. Civ. P. 56(h) statements of material facts relating to conduct that occurred after the complaint was filed, should be considered.

B.  Dissolution for Illegality and Oppression

[¶ 23] Napp contends that the Superior Court inappropriately entered a summary judgment for Parks Camp because there were genuine issues of material fact generated with respect to the issues of oppression and illegality warranting dissolution of the corporation.

[¶ 24] We review the grant of the motion for summary judgment de novo, "to determine if the parties' statements of material facts and referenced record evidence reveal a genuine issue of material fact." *See Lever v. Acadia Hosp. Corp.,* 2004 ME 35, ¶ 2, 845 A.2d 1178, 1179. The behavior that is statutorily sufficient to constitute oppressive or illegal corporate director action pursuant to 13–C M.R.S. § 1430(2)(B) is an issue of law that we review de novo. *Cf. Yeadon Fabric Domes, Inc. v. Me. Sports Complex, LLC,* 2006 ME 85, ¶ 13, 901 A.2d 200, 205.

[¶ 25] Although there are five permissible grounds for judicial dissolution in a proceeding by a shareholder pursuant to 13–C M.R.S. § 1430(2), Napp's contentions are based on section 1430(2)(B), which states as ground for dissolution: "The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent." 13–C M.R.S. § 1430(2)(B). Napp argues that there is a genuine issue of material fact as to whether the majority directors' actions constitute illegal and/or oppressive behavior within the meaning of section 1430(2)(B). We address each in turn below.

1.  Illegality

[¶ 26] Napp argues that the corporation's actions, including the failure to comply with the shareholder agreement's provision requiring that all shareholders be directors, and the failure to comply with the shareholder agreement and articles by not requiring unanimity for certain major financial conditions and borrowing money, constitute illegal acts for the purposes of

dissolution because the actions violate corporate law. *See* 13–C M.R.S. § 743. Parks Camp argues that the actions cited by Napp are all, at most, ultra vires acts, which are distinguishable from illegal acts for purposes of dissolution, and that the majority shareholders did not violate any statute or law.

[¶ 27] The Maine Business Corporation Act does not define the word "illegal." The plain meaning of the word "illegal" is "[f]orbidden by law; unlawful." BLACK'S LAW DICTIONARY 750 (7th ed.1999). Napp argues that pursuant to 13–C M.R.S. §§ 743 and 801(2) (2006), shareholder agreements and articles of incorporation are binding on the corporation and, therefore, violation of a shareholder agreement or the articles constitutes illegal corporate activity. Napp specifically points to the corporation's failure to comply with its shareholder's agreement requiring that all shareholders be directors, the failure to comply with the shareholder agreement and articles by not requiring unanimity for certain major financial decisions, and the fact that the corporation has allegedly borrowed money without complying with the articles and the shareholder's agreement.

[¶ 28] The United States District Court for the District of Maine addressed the issue of illegality for the purposes of judicial dissolution under the Maine statute, and concluded that corporate violations of building codes were not the type of illegality that justified dissolution pursuant to Maine's former statute governing dissolution, 13–A M.R.S.A. § 1115(1)(D) (1981) (repealed by 2001 P.L., ch. 640, § A–1 (effective July 1, 2003)). *Thompson's Point, Inc. v. Safe Harbor Dev. Corp.*, 862 F.Supp. 594, 601 (D.Me.1994). In interpreting a similar statutory provision for involuntary judicial dissolution, a Montana court noted: "In the context of corporate dissolution, 'illegality' is largely confined to

cases where the entire purpose for the corporate existence is illegal." *Blue Dane Simmental Corp. v. Am. Simmental Ass'n,* No. DV 94–277, 1997 Mont. Dist. LEXIS 50, at \* (Mont.Dist.Ct.1997) (citing *Commonwealth ex rel. Truscott v. Yiddisher Kultur Farband,* 382 Pa. 553, 116 A.2d 555 (1955)).

[¶ 29] Napp cites to no cases in which a court has found that violation of the articles of incorporation or a shareholder agreement constitute "illegal" activity for the purpose of dissolution. Instead, she cites to a Maine treatise, JAMES B. ZIMPRITCH, MAINE CORPORATION LAW & PRACTICE § 11.7(a) at 396 (1993), to argue that "illegal" activities warranting dissolution may include violations of the Maine Business Corporation Act itself.

[¶ 30] Here, there has been no allegation of a true violation of the statute, such as declaring illegal distributions or violating the statutory standard of conduct for directors. There are numerous other means for a shareholder to seek enforcement of a shareholder agreement or the articles of incorporation. In this case, Napp was given an opportunity to sign an agreement that would have stopped the "illegal" activity that is alleged, returning her to her role as a director and rescinding the code of ethics. Accordingly, the ultra vires corporate actions alleged are not the type of "illegal" corporate actions within the meaning of section 743 warranting involuntary judicial dissolution, and summary judgment was appropriately entered in favor of Parks Camp as to that claim.

2. Oppression

[¶ 31] Napp also asserts that her reasonable expectations with respect to the use of the camp, both as an investment and for personal use, have been thwarted by the corporate policy to rent out the camp to help pay for the legal expenses arising

out of Napp's suit for dissolution; that she has been frozen out by twice being removed from the board of directors in contravention of the shareholder agreement; and that the code of ethics, purportedly binding on all shareholders, was enacted in contravention of the shareholders' agreement and articles. She argues that these actions are sufficient to constitute oppression within the meaning of the statute.

[¶ 32] As with the term "illegality," the Maine Business Corporation Act does not define what conduct constitutes "oppressive" behavior warranting judicial dissolution of a corporation. In analyzing oppressive conduct in the context of close corporations, other courts have looked to both fiduciary duty and reasonable expectation concepts. *See* 19 AM. JUR. 2D *Corporations* § 2370 (2004); *Balvik v. Sylvester,* 411 N.W.2d 383, 388 (N.D.1987). Oppressive conduct has been defined as follows:

> [B]urdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of the company to the prejudice of some of its members; or a ... departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.

*Polk v. Hergert Land & Cattle Co.,* 5 P.3d 402, 404 (Colo.Ct.App.2000) (quotation marks omitted). The shareholder moving for dissolution has the initial burden of proving "overreaching conduct," and once she has done so, "the burden shifts to the majority shareholder or shareholders to show there were legitimate business justifications for the conduct." *Scott v. Trans–System, Inc.,* 148 Wash.2d 701, 64 P.3d 1, 5 (2003).

[¶ 33] Court determinations of what constitutes oppressive behavior are heavily fact-bound. The following acts have been construed as oppression warranting dissolution of a corporation: freezing out a shareholder from a business in which the shareholder reasonably expected to participate, *see Maschmeier v. Southside Press, Ltd.,* 435 N.W.2d 377, 379–81 (Iowa Ct. App.1988); *Balvik v. Sylvester,* 411 N.W.2d 383, 385–88 (N.D.1987); *Baker v. Commercial Body Builders, Inc.,* 264 Or. 614, 507 P.2d 387, 392–95 (1973); shareholders awarding themselves excessive compensation, furnishing inadequate dividends, or misapplying and wasting corporate funds, *see Muellenberg v. Bikon Corp.,* 143 N.J. 168, 669 A.2d 1382, 1388 (1996); *Whale Art Co. v. Docter,* 743 S.W.2d 511, 514–15 (Mo.Ct.App.1987); mismanaging corporate affairs, denying access to books and records, inaccurately or inequitably maintaining corporate books, and unequally using corporate assets for personal purposes, *see McCauley v. Tom McCauley & Son, Inc.,* 104 N.M. 523, 724 P.2d 232, 238 (Ct.App.1986); and majority shareholders diverting opportunities to other corporations, *see In re Charleston Square, Inc.,* 295 A.D.2d 425, 743 N.Y.S.2d 170, 171 (N.Y.App.Div.2002).

[¶ 34] By contrast, the following acts failed to rise to the level of oppression, justifying corporate dissolution: not maintaining a market for the sale of stock in a closely-held corporation, or offering to purchase stock at a price the minority shareholder believed was fair; not paying dividends, despite the corporation's cash-rich position; and compensating certain family member shareholders, *see Reget v. Paige,* 242 Wis.2d 278, 626 N.W.2d 302, 306–13 (Ct.App.2001); excluding a shareholder from the day-to-day operation of the corporation following his arrest and conviction for importing controlled substances, *see In re O'Neill,* 214 A.D.2d 736, 626 N.Y.S.2d 813, 814 (N.Y.App.Div.1995); and terminating the shareholder's employment on

the ground that he was actively working for another company during business hours, *see Ruzicka v. Hart Printing Co.,* 21 S.W.3d 67, 72 (Mo.Ct.App.2000).

[¶ 35] The facts alleged by Napp, including the majority shareholder actions that occurred following her complaint for dissolution, create genuine issues of material fact as to whether Napp was effectively frozen out of the corporation. These issues should be decided by a fact-finder and their existence precludes summary judgment. Napp was not given an opportunity to maintain a position on the board, in violation of the shareholder's agreement. Although the affidavits reflect that Napp may still make use of the property, she may only do so when the camp is not rented. Napp's shares in the corporation have also been diluted through the majority shareholders' decision to allow the shareholders to garner an additional "unit of ownership" by prepaying an assessment. Therefore, we cannot say as a matter of law that Napp has presented inadequate evidence of oppression within the meaning of section 1430(2)(B). Moreover, pursuant to 13–C M.R.S. § 1434(3) (2006), the court does have the discretion to grant relief other than dissolution "as an alternative to a decree of dissolution or whenever the circumstances of the case are such that the other relief, but not dissolution, would be appropriate."

The entry is:

Summary judgment as to that part of Napp's complaint based on alleged illegal acts is affirmed. Summary judgment is vacated as to that part of Napp's complaint based on alleged oppressive acts. Remanded to the Superior Court for further proceedings consistent with this opinion.