NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 81

No. 24-AP-067

| | |
|---|---|
| Garret Hirchak, Manufacturing Solutions, Inc., and Sunrise Development LLC | Supreme Court |
| | On Appeal from |
| v. | Superior Court, Lamoille Unit, Civil Division |
| Tyler Hirchak, Thomas Hirchak, III, Hirchak Brothers LLC, and Hirchak Group LLC | October Term, 2024 |

Mary Miles Teachout, J. (Ret.)

Christopher D. Roy and Monica H. Allard of Downs Rachlin Martin PLLC, Burlington, for
  Plaintiffs-Appellants/Cross-Appellees.

Kevin M. Henry and Angélina L. Debeaupuis of Primmer Piper Eggleston & Cramer, PC,
  Burlington, for Defendants-Appellees/Cross-Appellants.


PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1. **REIBER, C.J.** Plaintiffs Garret Hirchak, Manufacturing Solutions, Inc. ("MSI"), and Sunrise Development LLC ("Sunrise") appeal the trial court's order dissociating Garret from defendants Hirchak Brothers LLC ("Brothers LLC") and Hirchak Group LLC ("Group LLC") and requiring the LLCs to pay more than $900,000 in equity interest, unpaid compensation, and reimbursements. Plaintiffs argue that the trial court erred in: failing to recognize oppression by the majority members of the LLCs; treating a $300,000 down payment made by Garret on behalf of Group LLC as gratuitous; declining to order reimbursements for certain services and cash advances; and refusing to assess prejudgment interest on any of the reimbursements. Defendants Brothers LLC, Group LLC, Thomas Hirchak, and Tyler Hirchak cross appeal, arguing that the court erred in awarding compensation to Garret even after the date that it found he breached his

fiduciary duties. For reasons discussed below, we agree with defendants that Garret was not entitled to reimbursement of unpaid compensation after the date of his breach of the fiduciary duty of loyalty. We otherwise affirm the trial court's order.

## I. Background

¶ 2. The trial court made the following findings of fact. Thomas Hirchak ("Tom") founded Thomas Hirchak Company ("THCo"), an auctioneering business, in the mid-1970s. His three sons, Garret, Thomas ("Toby"), and Tyler, all worked at the business from an early age. However, while Toby and Tyler continued to work there throughout their careers, Garret left the family business and started multiple businesses of his own, including MSI and Sunrise. THCo became a successful business, expanding to include real-estate, commercial, and automobile auctions. Toby and Tyler worked fifty-to-sixty hours per week on various aspects of the business, with Tyler specializing in real estate and Toby in commercial auctions, but neither was involved in the financial side of the business.

¶ 3. In 2015, Tom acquired a piece of real estate on Bridge Street in Morrisville ("the Bridge Street property") that was ideal for auctions and had the potential to benefit the business. However, after Toby and Tyler helped secure the required zoning permits, Tom decided to sell the property to Garret rather than use it for auctions. Tom and Garret agreed that Garret would pay Toby and Tyler 10% of the sale price—$270,000—over a twenty-year period as recognition for their work in securing the zoning permits.

¶ 4. In 2018, Tom began preparing to exit the business and entered negotiations with Garret, Toby, and Tyler, to sell THCo and Tom's associated real estate holdings. To complete the transaction, Garret filed papers to create two LLCs: Brothers LLC and Group LLC. In September 2018, Brothers LLC purchased THCo's business assets for $2.7 million, payable to Tom in monthly $15,000 installments for which the brothers were personally responsible. Group LLC purchased the real estate for the company's offices and auction sites for $2.2 million, including a

2

$300,000 down payment. Though Toby and Tyler offered to contribute to the down payment by forfeiting the money owed to them from the sale of the Bridge Street property, Garret ignored their offer and paid the $300,000 entirely out of his own pocket.

¶ 5. The three brothers did agree to the following terms for the LLCs: (1) the brothers would be equal member owners; (2) no brother would receive distributions simply for being a member, but they would receive compensation for working on behalf of Brothers LLC; (3) each brother would receive equal compensation for their work; (4) each brother would be primarily responsible for one of the three divisions—Tyler for real estate, Toby for commercial, and Garret for automobiles; and (5) each brother would have equal management responsibility. On Garret's suggestion, the brothers agreed that Garret's compensation would be paid to MSI as an independent contractor. The agreement also stated that:

> [e]ach member shall agree not to own an interest in, manage or work for another business, enterprise or endeavor, if such ownership or activities would compete with [Brothers] LLC's business goals, mission, profitability or productivity, or would diminish or impair the member's ability to provide maximum effort and performance in managing the business of [Brothers] LLC.

Finally, the agreement required "books of account of the LLC's financial transactions" to be kept at the LLC's principal place of business. The brothers otherwise made no specific agreements about the type or amount of work required to receive compensation or how other aspects of financial management would be handled.

¶ 6. THCo's bookkeeper retired at the same time as the sale of the business, so Brothers LLC had to develop a new system of financial management. Garret proposed that bookkeeping, accounting, human resources, and IT services could all be done on an "a la carte" basis by his company MSI, and that his other company, Sunrise, could provide property management services for the real estate division. Garret told Toby and Tyler that it would be cheaper for the company to pay for services in this manner rather than hiring fulltime employees. Toby and Tyler trusted Garret's business expertise and accepted his recommendations. When MSI provided similar

3

services to other businesses, it drafted written proposals describing its services and rates, but no similarly detailed document was prepared here.[1]  Aside from the details of their arrangement outlined above, the brothers never discussed the rates that would be charged for services or whether the billing would include contributions to MSI's overhead or profits.

¶ 7.  While the brothers never specifically discussed responsibility for financial management, Garret took over this role.  Various MSI employees worked on behalf of Brothers LLC, billing the company at rates that included a markup above the amount paid to the employees by MSI.  Financial files and management tools were kept at MSI's office and not at Brothers LLC's office.  Garret controlled Brothers LLC's checkbook, which was also kept at MSI's office.  MSI prepared invoices on behalf of itself and Sunrise, which Garret paid on behalf of Brothers LLC.  These invoices included the work done by MSI and Sunrise, Garret's compensation as an independent contractor, and an automobile allowance for Garret's weekly travel to the auction site.  Toby and Tyler received cashflow and profit-and-loss reports, but had no access to supporting documents without going to the MSI office during business hours, which the court found was not realistic given the long hours they worked in the field.  Nevertheless, Toby and Tyler acquiesced to this system, trusting that Garret's interest was the same as theirs.

¶ 8.  In December 2018, Brothers LLC began to face a cash shortfall, and Garret put in $20,000 to cover it.  The brothers never discussed how this infusion of money would be treated.  Garret set up a line of credit through Sunrise, which Brothers LLC repaid as cash became available.  Although business was steady, Brothers LLC continued to face cashflow shortages throughout 2019, and Garret put in periodic cash infusions totaling $110,000.  Brothers LLC repaid some of the funds without paying any interest, leaving $75,430 unreimbursed.  In March 2019, Garret reviewed the amounts of the invoices to MSI and decided to reduce the billing rates.  By October

---

[1]  Garret argued below that he presented Toby and Tyler with a proposal but the court found that this was "a highly simplified and generalized projection on one-third of a page of how charges might be calculated and not a proposed schedule of costs for services."

2019, Garret suspended payments on the invoices due to cashflow problems, including invoices that covered his own compensation for working on behalf of Brothers LLC.

¶ 9. Starting in early 2020, Toby and Tyler began asking more questions about the state of the business's finances. They also questioned whether Garret was carrying his weight as an employee. While they continued to put in fifty-to-sixty hours per week, they speculated that Garret was working far less and was charging for MSI employees to perform the work they expected him to do. In March, Toby and Tyler sought to move the financial records to Brothers LLC's principal place of business, as provided in the operating agreement. Garret resisted, indicating that he would retain the records until Toby and Tyler presented their own financial plan. Toby provided a plan, but Garret continued to refuse to produce the records, saying he would need more details. In May, Garret proposed that the others buy him out of the business for $650,000, but even as the brothers discussed the possibility, Garret continued to withhold the financial records. In June, Toby and Tyler sought to hold a face-to-face meeting to discuss finances, but Garret resisted. Toby and Tyler made a formal resolution for a members' meeting, which Garret said he could not attend. After Toby and Tyler postponed and rescheduled the meeting several times, Garret indicated that he would not attend such a meeting and would instead be involving his lawyer. In July, Garret again proposed that he be bought out or, in the alternative, that he be permitted to acquire the auto division of Brothers LLC.

¶ 10. At the same time, Brothers LLC had insufficient funds to make the monthly $15,000 loan payment owed to Tom, and Garret directed MSI to pay it. Garret continued to make periodic infusions of cash into Brothers LLC through August 2020. Toby and Tyler were not aware of many of these advances, or the need for them, until mid-2020, and were not asked to participate in making them. At some point, Garret told Toby and Tyler that they had to put money into the business, and they put in $125,000. No discussions were ever held as to how these cash advances would be treated. Some were repaid partially or fully, without interest.

¶ 11.    In August 2020, Toby and Tyler filed suit against Garret to have the financial books moved to Brothers LLC's offices.  The three brothers quickly settled the lawsuit, agreeing that the books could be moved, that a third-party inspection would be done, and that Garret would continue to be an independent contractor.  The books were transferred in September, and Brothers LLC hired an in-house bookkeeper.  In October, Brothers LLC stopped using any services from MSI or Sunrise, though MSI continued to send invoices for Garret's compensation.  Though the court found no evidence that MSI's billings had been inflated, it noted that management expenses were considerably lower after this transition and that bookkeeping costs were reduced by $50,000 per year.

¶ 12.    In December, Garret filed the first of the three consolidated lawsuits now on appeal, seeking the dissolution and winding up of Brothers LLC.  In January 2021, Toby and Tyler removed Garret as an employee of Brothers LLC.  Toby and Tyler assumed financial management of the company and refused to pay outstanding invoices from MSI for services or Garret's compensation.  In July 2021, MSI and Sunrise initiated the second of the consolidated lawsuits, seeking to collect on invoices billed to Brothers LLC.  In April 2023, Toby and Tyler filed a third suit, seeking to dissociate Garret from both Brothers LLC and Group LLC and requesting disgorgement of profits on an unjust-enrichment claim.  Garret later revised his claims in the first lawsuit, seeking to be bought out of his share of Brothers LLC and to purchase Toby and Tyler's shares of Group LLC or, alternatively, to be bought out of both LLCs.  He also sought reimbursement of the cash advances to Brothers LLC.  The civil division consolidated the three cases and held a bench trial in December 2023.

¶ 13.    The court issued a written order in January 2024.  The court concluded that Garret violated his fiduciary duties, necessitating his dissociation from both Brothers LLC and Group LLC.  The court ordered defendants to pay a total of $375,000 to buy out Garret's equity interest in the two companies.  The court also determined that Garret was entitled to reimbursement of

$215,430 for cash advances made prior to March 2020; after that time, Garret was not entitled to reimbursement because he was actively preventing Toby and Tyler from assessing the business's finances to trim costs elsewhere. Garret was also entitled to reimbursement of $213,591.84 for unpaid compensation from October 2019 to January 2021. After that time, the court concluded, Garret was no longer performing work for Brothers LLC and was therefore not entitled to compensation. Finally, MSI and Sunrise were entitled to reimbursement of $71,537.64 and $50,214.57 respectively for unpaid invoices prior to March 2020, but were not entitled to reimbursement after that time because Brothers LLC no longer acquiesced to the services. The court denied prejudgment interest for any of the reimbursements because there was no agreement to pay interest and the course of dealing showed that no interest had been paid in prior reimbursements. The court otherwise denied the parties' claims for relief, including Garret's claim for restructuring based on oppression and his claim for reimbursement of the $300,000 down payment for Group LLC's real-estate acquisitions. Plaintiffs appeal the court's order, and defendants cross appeal.

## II. Discussion

¶ 14. Plaintiffs raise four claims of error. First, they argue that notwithstanding Garret's breach of fiduciary duties, the court should have found that Toby and Tyler engaged in oppressive behavior under 11 V.S.A. § 4101(a)(5)(B). Second, they contend that the court erred in treating the $300,000 down payment as a gift not subject to reimbursement, and they renew their claim for prejudgment interest on the payment. Third, they argue that the court arbitrarily denied reimbursement of Garret's cash advances and MSI's invoices starting in March 2020. Finally, they request prejudgment interest on the reimbursements for the cash advances and invoices. Defendants cross appeal, arguing that Garret was not entitled to receive compensation from October 2019 through January 2021 given his breach of fiduciary duties.

7

¶ 15. "Our standard of review of a trial court's findings made following a bench trial is limited." Kwon v. Edson, 2019 VT 59, ¶ 23, 210 Vt. 557, 217 A.3d 935. We review factual findings for clear error and will not disturb a finding "even if it is contradicted by substantial evidence, unless there is no credible evidence to support the finding." Rubin v. Sterling Enters., Inc., 164 Vt. 582, 588, 674 A.2d 782, 786 (1996). "Where the trial court has applied the proper legal standard, we will uphold its conclusions of law if reasonably supported by its findings." Highgate Assocs. v. Merryfield, 157 Vt. 313, 315-16, 597 A.2d 1280, 1281-82 (1991). However, we review pure questions of law de novo. Benson v. MVP Health Plan, Inc., 2009 VT 57, ¶ 4, 186 Vt. 97, 978 A.2d 33.

## A. Oppression

¶ 16. Plaintiffs first argue that the court erred in failing to find that Toby and Tyler engaged in oppressive behavior. Plaintiffs assert that Garret had two key expectations in signing the operating agreement: (1) that each owner would be primarily responsible for managing one part of the business; and (2) that the owners would be equally compensated for managing their divisions. Plaintiffs argue that by ceasing payments and seeking to terminate Garret's employment, defendants substantially defeated Garret's reasonable expectations that were central to his decision to join the venture. Plaintiffs contend that this constitutes oppression under 11 V.S.A. § 4101(a)(5)(B), which would permit the court to equitably restructure the ownership and management of the LLCs. See id. § 4101(b). Plaintiffs do not appeal the court's finding that Garret violated his fiduciary duties, but they argue that Garret's violation of his duties does not diminish the fact of Toby and Tyler's oppression.

¶ 17. Section 4101(a)(5)(B) of Title 11 permits dissolution or other discretionary relief upon the entry of an order finding that the majority members of an LLC "have acted or are acting in a manner that is oppressive and was, is, or will be directly harmful to the applicant." Title 11

does not define the term "oppression," nor has this Court ever addressed the meaning of the term in this context. We therefore look to decisions from other state courts to guide our analysis.

¶ 18. In determining the meaning of oppression in this context, the majority of state courts have adopted the "reasonable-expectations" test, which looks to whether "the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture." Straka v. Arcara Zucarelli Lenda & Assocs. CPAs, P.C., 92 N.Y.S.3d 567, 573 (Sup. Ct. 2019) (quotation omitted); see Manere v. Collins, 241 A.3d 133, 154 (Conn. App. Ct. 2020) (collecting cases); see also 16A Fletcher Cyclopedia of the Law of Corporations § 8046.10 (2024). Other courts have adopted the "fair-dealings" test, which looks to whether the majority members have engaged in

> burdensome, harsh and wrongful conduct, a lack of probity and fair
> dealing in the affairs of a company to the prejudice of some of its
> members, or a visible departure from the standards of fair dealing
> and a violation of fair play on which every shareholder who entrusts
> money to a company is entitled to rely.

16A Fletcher Cyclopedia, supra, § 8046.10; see, e.g., Napp v. Parks Camp, Ltd., 2007 ME 126, ¶ 32, 932 A.2d 531; Robinson v. Langenbach, 599 S.W.3d 167, 180-81 (Mo. 2020). We note that these two approaches are "not mutually exclusive, and will frequently be found to be equivalent." Gimpel v. Bolstein, 477 N.Y.S.2d 1014, 1019 (Sup. Ct. 1984). However, the fair-dealings test focuses on " 'preserving the majority's discretion to make decisions in furtherance of a legitimate business purpose' " while the reasonable-expectations test "analyzes the conduct at issue from the perspective of the minority shareholder." Manere, 241 A.3d at 153 (quoting D. Moll, Shareholder Oppression in Close Corporations: The Unanswered Question of Perspective, 53 Vand. L. Rev. 749, 762 (2000)).

¶ 19. We need not decide which test to adopt here because we conclude that plaintiffs' claim fails under either test and that the court therefore did not err in denying plaintiffs' claim for oppression. As numerous courts have recognized, "an expectation of continuing employment is

9

not reasonable and oppression liability does not arise when the shareholder-employee's own misconduct or incompetence causes the termination of employment." Gunderson v. All. of Comput. Pros., Inc., 628 N.W.2d 173, 192 (Minn. Ct. App. 2001); see, e.g., Manere, 241 A.3d at 158; In re Kemp & Beatley, Inc., 473 N.E.2d 1173, 1180 (N.Y. 1984); Meiselman v. Meiselman, 307 S.E.2d 551, 564 (N.C. 1983); see also Edler v. Edler, 2008 WI App 17, ¶¶ 8-9, 745 N.W.2d 87 (Wis. Ct. App.) (per curiam) (affirming trial court's decision that rejected shareholder's termination from employment as evidence of shareholder oppression under fair-dealing standard); 12B Fletcher Cyclopedia, supra, § 5820.11 (noting that courts may require complaining shareholder to show "the frustration was without fault of the complaining shareholder and was in large part beyond their control").

¶ 20.   Here, the court found that Garret violated his fiduciary duties by (1) failing to make an explicit agreement as to the rates charged by MSI and assuming complete control over bills paid to his personal companies; and (2) actively preventing Toby and Tyler from accessing the company's financial records for six months.  These actions constituted self-dealing, in violation of the duty of loyalty, and violated both the obligation of good faith and fair dealing and the terms of the operating agreement.  The court also found that Toby and Tyler attempted to schedule a members' meeting to discuss finances in June 2020, but Garret refused to attend despite the majority members rescheduling the meeting multiple times to accommodate him.  The majority members still did not seek to terminate Garret's employment until January 2021—a month after Garret filed suit seeking dissolution of the company.  Thus, the court's unchallenged findings establish that Garret breached his fiduciary duties, rejected attempts to include him in member meetings, and was terminated only after he sued to dissolve the company.  Under these circumstances, we conclude that Garret cannot make out a claim for oppression based on his termination from employment.  See Kemp & Beatley, Inc., 473 N.E.2d at 1180 ("[T]he minority shareholder whose own acts, made in bad faith and undertaken with a view toward forcing an

10

involuntary dissolution, give rise to the complained-of oppression should be given no quarter in the statutory protection.").

## B. $300,000 Down Payment

¶ 21. Next, plaintiffs argue that the court erred in denying reimbursement of the $300,000 down payment for Group LLC's real-estate purchase and in applying a presumption that the payment was undertaken without expectation of reimbursement. Plaintiffs argue that no such presumption is present in our case law and that they should be entitled to recover the funds absent proof of an affirmative intent to make a gift. They also point out that defendants agreed in their proposed conclusions of law before the trial court that "Garret is entitled to recover the $300,000 capital contribution because these funds contributed directly to the equity or enterprise value of the company." Finally, citing 11 V.S.A. § 4060(d), plaintiffs argue that Garret was entitled to recover interest beginning from the date of the payment.

¶ 22. The trial court concluded that Garret's $300,000 cash payment for Group LLC's real-estate purchase was neither a capital contribution nor a loan. Rather, because expectation of repayment was never communicated, the court characterized the payment as "money simply paid voluntarily with no agreement to a legally enforceable right to reimbursement or other consequences." The court also found that Garret had breached his fiduciary duties by "refusing to let Tyler and Toby contribute their equal shares for the down payment for the purchase of LLC real estate in 2018, and then claiming five years later . . . that he is entitled to compensation not only for the full amount but with interest."

¶ 23. We agree with the trial court that the $300,000 down payment was not subject to any right of reimbursement.[2] First, we reject the argument defendants made below that the down

---

[2] The court cited a treatise for the proposition that "[i]f services are rendered within the family relationship there is a presumption that they were rendered without expectation of compensation." J. Calamari & J. Perillo, Contracts § 2-18, at 86-87 (3d ed. 1987). As plaintiffs note, this passage refers to the provision of "services," not direct monetary transfers, and would apply only in that context. However, as we have repeatedly recognized, "this Court may affirm a

11

payment can be considered a capital contribution. The operating agreement specifies that additional capital contributions may only occur "by unanimous vote," and no such vote occurred here. Moreover, even if we were to ignore the formalities required by the operating agreement, treating the down payment as a capital contribution would create absurd results. The operating agreement specifies that each member's interest in the company is determined based on the fraction of total capital contributions made by that member. Previous capital contributions amounted to only $300 total. Treating the $300,000 down payment as a capital contribution would thus result in Garret having a near 100% stake in Group LLC.

¶ 24. Nor can we conclude consistent with the trial court's unchallenged findings that the down payment qualifies as a loan. The court found that there was never any agreement that the down payment would be classified as a loan and that "any such expectation [of repayment] was only in [Garret's] mind." Garret made the payment without consulting Toby or Tyler. When Toby and Tyler tried to contribute, in the form of an agreement to forsake the money owed to them from the Bridge Street property, Garret simply ignored their offer and made the payment himself. A loan is a type of contract, requiring mutual consent of the parties. See 9 Williston on Contracts § 20:5 (4th ed. 2024) ("A loan consists of the provision of a sum of money by one party to another who thereby becomes bound by a contract to return an equivalent amount with or without an additional sum payable for its use."); In re Goodman, 790 N.Y.S.2d 837, 843 (Surr. Ct. 2005) ("A 'loan' is a contract by which one party advances monies to the other upon a promise to repay. Like any contract, it requires mutuality of consent." (citations omitted)). While such an agreement can be implied, plaintiffs do not explicitly challenge the trial court's findings that no contract was made

---

trial court's decision if the correct result is reached, despite the fact that the court based its decision on a different or improper rationale." Bloomer v. Gibson, 2006 VT 104, ¶ 26 n.4, 180 Vt. 397, 912 A.2d 424 (quotation omitted). For the reasons discussed below, we are convinced that the trial court reached the correct result, even if the presumption it applied was incorrect.

here and do not otherwise point to any evidence showing mutual consent. Absent some proof of mutual consent, there could be no contract for a loan here.

¶ 25. Plaintiffs argue that the down payment qualifies as a loan under 11 V.S.A. § 4060(d), which provides that "[a] payment or advance that gives rise to an obligation of a limited liability company under subsections (a) through (c) of this section constitutes a loan to the company." However, the LLC had no obligation under either subsection (a) or (c).[3] Section 4060(a) provides for reimbursement of "payments made . . . by the member or manager in the ordinary and proper conduct of the activities" of the LLC. However, the court here found that Garret's actions relating to the down payment were not "proper" in that he violated his fiduciary duties by "refusing to let Tyler and Toby contribute their equal shares for the down payment . . . and then claiming five years later, during which time he made no payments of the Bridge Street money, that he is entitled to compensation," including interest. Section 4060(c) provides that an LLC "shall reimburse a member for an advance to the company beyond the amount of contribution the member agreed to make." But an "advance" is a type of loan, and therefore a type of contract, requiring mutual consent. See, e.g., In re Mercer, 246 F.3d 391, 415 n.30 (5th Cir. 2001) ("[A] cash advance is a loan, not a gift. Inherent in any loan is a promise to pay." (emphases omitted)). As the court found, Garret simply made the $300,000 down payment "unilaterally" without communicating any expectation of repayment or reaching any agreement that it would be treated as a loan. No contractual obligation of repayment could arise if there was never mutual consent to such an agreement.

¶ 26. We are thus left with at most a quasi-contract, potentially reimbursable in equity under a theory of unjust enrichment. See 1 Williston on Contracts, supra, § 1:6 ("[A]n implied-in-law 'quasi-contract' is not a contract at all, but an obligation imposed by the court to bring about

---

[3] Section 4060(b) relates to reimbursements for insurance on behalf of members, and has no application here.

13

justice and equity . . . and is also referred to by some courts as unjust enrichment or restitution."). "Under the doctrine of unjust enrichment, a party who receives a benefit must return the benefit if retention would be inequitable." Kellogg v. Shushereba, 2013 VT 76, ¶ 22, 194 Vt. 446, 82 A.3d 1121 (quotation and brackets omitted). A claim of unjust enrichment requires three showings: "(1) a benefit was conferred on [the] defendant; (2) [the] defendant accepted the benefit; and (3) [the] defendant retained the benefit under such circumstances that it would be inequitable for [the] defendant not to compensate [the] plaintiff for its value." Beldock v. VWSD, LLC, 2023 VT 35, ¶ 68, __ Vt. __, 307 A.3d 209 (quotation omitted). "Whether a party has been unjustly enriched is a question of fact; however, whether a claim for unjust enrichment can be maintained, given certain facts, is a legal question reviewed de novo." Id.

¶ 27.    Applying this test, we conclude as a matter of law that under the circumstances here it would not be inequitable for defendants to retain the benefit of the $300,000 down payment. As the court found, Garret breached his fiduciary duties in multiple ways, including by failing to negotiate with Toby and Tyler over the down payment and instead unilaterally contributing the money. While not directly related to this transaction, Garret also breached his duties by engaging in self-dealing and by withholding financial records to which the company was entitled. See Mueller v. Mueller, 2012 VT 59, ¶ 28, 192 Vt. 85, 54 A.3d 168 (stating that unjust enrichment "may not be determined from a limited inquiry confined to an isolated transaction" but should instead be "based on a broad view of the human setting involved" (quotation omitted)). It was this breach of fiduciary duties that necessitated Garret's dissociation from the company and that deprived him of the benefit of Group LLC's purchase of the real estate.[4] It is a basic principle of

--------

[4] Even so, by awarding plaintiffs $300,000 in equity interest for Garret's share of Group LLC, the court appears to have partially reimbursed Garret for the down payment. The parties agreed that Garret's one-third share of Group LLC would be $300,000, reflecting a total valuation of the company of $900,000. Because Group LLC's sole asset is the real estate, this total valuation presumably includes the $300,000 contribution that Garret made, thereby increasing the company's valuation and Garret's equity payout.

unjust enrichment that "[a] person is not permitted to profit by his own wrong." Restatement (Third) of Restitution and Unjust Enrichment § 3 (2011). And as the court found, "Garret's conduct created this controversy." Because Garret unilaterally conferred the benefit on Group LLC and later necessitated dissociation through his breach of fiduciary duties, we conclude that it is not inequitable for defendants to retain the benefit of the $300,000 down payment.

## C. Cash Advances and Invoices After March 2020

¶ 28.    Plaintiffs' third argument is that the trial court erred in denying reimbursement of Garret's cash advances and MSI's invoices after March 2020. Plaintiffs point out that the cash advances and the invoiced services continued after March 2020, with the same terms as before and the same benefit to Brothers LLC. They argue that denying reimbursement constitutes unjust enrichment because plaintiffs conferred a benefit that defendants accepted, which would be inequitable for defendants to keep after ousting Garret. In their reply brief, plaintiffs reverse course and argue that their claims are not equitable but are instead "statutory and contractual in nature."

¶ 29.    Beginning with the cash advances, we affirm the court's holding that Garret was not entitled to reimbursement for payments after March 2020. Based on the court's findings, the parties had no valid contract with respect to the cash advances. The court found that for the first advance, there was "[n]o evidence that [Garret] discussed this with Tyler and Toby" and "[n]o agreement as to how this infusion of money would be treated." For the contributions in 2019, the court again found that Garret alone decided when he would advance cash and that there was "no agreement with Tyler and Toby as to how they would be handled." The court noted that "[t]here is no evidence that Tyler and Toby even knew about many of these advances, or the need for them, until mid or late 2020, nor were they asked to participate in making them." When Tyler and Toby eventually made their own cash contributions, there was again "no discussion or arrangements as to how it would be treated." As the court noted, Garret "acknowledges that there was no documentation establishing a loan agreement or interest obligation in connection" with his

15

advances. On appeal, plaintiffs point to no contrary findings or evidence that would lead to the conclusion that the parties had a contract here.

¶ 30. Because the parties made no contract here, we must again analyze these payments under principles of unjust enrichment. See Brookside Mem'ls, Inc. v. Barre City, 167 Vt. 558, 559, 702 A.2d 47, 49 (1997) (mem.) ("Under a quasi-contract theory of unjust enrichment, the law implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable."). With respect to the payments after March 2020, we agree with the trial court that defendants were not unjustly enriched. As the court found, after March 2020, Garret's refusal to return the company's financial records "frustrated the ability of the members to understand the finances of the business in order to manage it responsibly." Obtaining the records was a necessary first step to try to rectify the company's financial problems. By refusing to provide the records, Garret prolonged the company's struggles, necessitating the cash advances. At the same time, Garret was personally benefitting from payments being made by Brothers LLC to his companies. Because Garret's breach of fiduciary duties exacerbated the company's financial troubles, prolonging the need for the cash infusions, the court did not err in concluding that plaintiffs were not entitled to reimbursement under a theory of unjust enrichment.

¶ 31. Turning to the unpaid invoices, the court's findings support a conclusion that there was a valid contract for the provision of services by MSI and Sunrise. The court found that "Tyler and Toby relied on Garret's business knowledge and experience and accepted" his recommendation that bookkeeping and other services be provided by Garret's companies. While the court found that no detailed agreement was ever prepared and that there was no discussion of rates for services, it noted that "Tyler and Toby trusted Garret and accepted his representation that it would be less expensive for Brothers LLC to use a la carte services." Garret therefore took on "sole responsibility for all financial matters," including the agreement for services, while Toby and Tyler "let this happen" based on their trust "that [Garret's] interest was the same as theirs."

16

¶ 32. These findings suggest that Garret had actual authority to enter Brothers LLC into a contract for services with MSI and Sunrise, notwithstanding his conflict of interest. See Restatement (Third) of Agency § 2.01 (2006) ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."). Thus, Garret could validly enter Brothers LLC into a binding contract for "a la carte" services with MSI.

¶ 33. However, beginning in March 2020, the conflict over control of the company's finances meant that Garret no longer had actual authority to unilaterally enter a contract on the company's behalf. See id. § 3.09 ("An agent's actual authority terminates . . . upon the occurrence of circumstances on the basis of which the agent should reasonably conclude that the principal no longer would assent to the agent's taking action on the principal's behalf."). During this period, Garret actively resisted the majority members' efforts to wrest control of the company's finances from him, ultimately forcing the majority members to bring suit to obtain financial records that they were entitled to under the operating agreement. Garret also refused to attend meetings with the majority members and made multiple entreaties to be bought out of the business. Under these circumstances, Garret could reasonably conclude that Brothers LLC would no longer assent to his entering the company into financial transactions with his personal businesses.

¶ 34. Nor did Garret have apparent authority to act on the company's behalf during this time. See id. § 2.03 ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."). Since the "third party" here was Garret's own company, his knowledge can be imputed to it, such that there could be no reasonable belief that Garret continued to have authority to enter Brothers LLC into contracts for a la carte services. Garret, and by extension MSI, knew

17

that the majority members of Brothers LLC were contesting his control over the company's finances, yet he continued to contract for services that personally enriched him.

¶ 35. Absent apparent or actual authority, Garret could not enter Brothers LLC into binding contracts with his own businesses beginning in March 2020. As the trial court concluded, "[w]hile Tyler and Toby apparently ceded the authority for this to happen during the first year and a half, by March 2020 they no longer did." Indeed, once the majority members obtained access to the company's financial records, they quickly "stopped using services from MSI and Sunrise," resulting in a considerable reduction in management expenses and savings of $50,000 per year on bookkeeping. Absent a binding contract, we review the invoiced services under the equitable principles of unjust enrichment. Given the numerous findings of Garret's breach of fiduciary duties, we agree with the trial court that MSI is not entitled to reimbursement after March 2020 because it would not be inequitable for Brothers LLC to keep the benefits conferred on it.

## D. Prejudgment Interest

¶ 36. Plaintiffs' final claim of error is that the court should have granted prejudgment interest on the invoices from MSI and the cash advances paid by Garret. Plaintiffs argue that prejudgment interest is mandated in cases where damages are "liquidated or reasonably ascertainable." Est. of Fleming v. Nicholson, 168 Vt. 495, 501, 724 A.2d 1026, 1030 (1998) (quotation omitted). Here, they argue, there was no genuine dispute as to the amount of the advances or invoices, so prejudgment interest must be included. And because there was no agreement as to the rate of interest, the 12% rate stated in 9 V.S.A. § 41a(a) must apply.

¶ 37. Starting with the cash advances, we conclude that the court did not err in declining to award prejudgment interest. As discussed previously, there was never a valid contract for the payments, and the court-ordered reimbursement was based in equitable principles of unjust enrichment. Prejudgment interest is " 'awarded as of right when the principal sum recovered is liquidated or capable of ready ascertainment and may be awarded in the court's discretion for other

18

forms of damage.' " Martin v. Lyon, 2024 VT 68, ¶ 10, __ Vt. __, __ A.3d __ (quoting Reporter's Notes—1981 Amendment, V.R.C.P. 54). Applying this rule, we have previously recognized that prejudgment interest is not available as of right for various equitable claims. See Remes v. Nordic Grp., Inc., 169 Vt. 37, 41, 726 A.2d 77, 80 (1999) (concluding that "in a promissory estoppel case the question of interest may be more properly committed to the sound discretion of the trial court than awarded as of right"); Martin, 2024 VT 68, ¶ 19 (concluding that "prejudgment interest is not a remedy available to the court in fashioning a partition award"); see also N.Y. Life Ins. Annuity Corp. v. Ashworth, No. 5:12-cv-215, 2014 WL 12717647, at *4 (D. Vt. Apr. 7, 2014) ("[T]his court anticipates that the Vermont Supreme Court would hold that prejudgment interest is committed to the discretion of the trial court and not available as of right in an interpleader action.").

¶ 38. The same is true here; unlike contractual or tort claims, awards of prejudgment interest on an unjust-enrichment claim are discretionary. As we have explained, damages are not reasonably ascertainable where "the parties dispute how the jury could arrive at the damages it awarded." Winey v. William E. Dailey, Inc., 161 Vt. 129, 141, 636 A.2d 744, 752 (1993). In an unjust-enrichment claim, the measure of damages does not just require calculation of the amount of benefit conferred, but also an assessment of how much of that benefit would be inequitable for the defendant to retain. See Beldock, 2023 VT 35, ¶ 68. The uncertainty in this calculation means that the parties will invariably dispute how the jury could arrive at the damages. As a result, prejudgment interest may only be awarded at the discretion of the trial court, not as of right. See, e.g., Ross v. Ross, 178 P.3d 639, 644 (Idaho Ct. App. 2007) (concluding prejudgment interest for unjust-enrichment claim was discretionary because claim required consideration of not just value of services but also "how much it would be inequitable for [defendant] to retain without reimbursing [plaintiff]"); Shoreline Dev., Inc. v. Utah Cnty., 835 P.2d 207, 212 (Utah Ct. App. 1992) ("[T]he lack of mathematical certainty generally prevents an award of prejudgment interest

in equity claims."); Irwin Concrete, Inc. v. Sun Coast Props., Inc., 653 P.2d 1331, 1337-38 (Wash. Ct. App. 1982) (concluding "[p]re-judgment interest is not allowable in" unjust-enrichment action where measure of damages was based on quantum meruit); Indu Craft, Inc. v. Bank of Baroda, 87 F.3d 614, 617 (2d Cir. 1996) ("An award of prejudgment interest on an equitable claim is discretionary.").

¶ 39.    We therefore review the court's determination that prejudgment interest was not warranted here for abuse of discretion, which requires a showing that the court "entirely withheld its discretion or that it exercised discretion for clearly untenable reasons or to a clearly untenable extent." Remes, 169 Vt. at 39-40, 726 A.2d at 79 (quotation omitted).  Applying this standard, we conclude that the court did not abuse its discretion in declining to award prejudgment interest on the reimbursements for the cash advances.  The court concluded that there was never any agreement that interest would be charged, and that the parties' course of performance shows that interest was never contemplated.  It was Garret who unilaterally chose to make the cash advances and who controlled when the company would repay them.  Requiring the company to reimburse Garret with interest would not serve the purposes of unjust enrichment under these circumstances. Accordingly, the court acted within its discretion in denying prejudgment interest.[5]

¶ 40.    Turning to the invoices from MSI, we conclude that the court properly denied prejudgment interest based on the parties' course of performance.  While there was a contract for services, the breach of which would ordinarily require prejudgment interest if damages were liquidated or reasonably ascertainable, the parties' course of performance here shows that the parties waived the right to interest.  In ascertaining the terms of a contract, "[t]he contract and its terms may be implied from the facts surrounding the transaction." Cushman v. Outwater, 121 Vt.

---

[5] For the reasons discussed previously, we also reject plaintiffs' argument that 11 V.S.A. § 4060 entitled them to prejudgment interest on the cash advances.  Because there was no agreement between the parties, the company had no obligation that triggered the interest provision of § 4060(d).

426, 429, 159 A.2d 89, 91 (1960). Moreover, "[t]he factfinder . . . may rely on course of performance as an indicator of the parties' intent when construing an ambiguous agreement." Beldock, 2023 VT 35, ¶ 41 n.9. The court here found that "[t]here is no evidence that there was an agreement that MSI would be paid interest on unpaid balances" or that "any MSI invoices ever showed a claim for interest on any suspended amounts," despite a long history of delayed payments on the invoices. If interest were part of the parties' unwritten contractual agreement, MSI would have previously charged interest on suspended amounts. The court therefore did not err in denying interest based on the parties' previous actions.

### E. Garret's Compensation

¶ 41. Finally, defendants cross appealed, arguing that Garret is not entitled to compensation from October 2019 to January 2021 due to his breach of fiduciary duties. Defendants contend that the court's award of full compensation to Garret is incongruous with its finding that Garret breached the duty of loyalty. They also suggest that there can be no enforceable contract for Garret's compensation because the parties never agreed as to the amount of work required to receive compensation.

¶ 42. As an initial matter, we agree with the trial court that there was an enforceable agreement for Garret's compensation. The operating agreement makes clear that while "[m]embers shall not be paid as members of the LLC for performing any duties associated with such membership," they may be paid "for any services rendered in any other capacity for the LLC, whether as officers, employees, independent contractors or otherwise." Prior to October 2019, when Garret suspended payment of his own compensation due to cashflow shortages, Garret was paid for his work as an employee of Brothers LLC. Thus, as the court found, while the parties did not reach any specific agreement about what work was required for compensation, the parties' actions indicate that Garret's performance was sufficient to earn compensation. There is no

21

allegation that Garret began working less after October 2019; therefore, given the parties' past actions, Garret would still be entitled to compensation under the same terms after that date.

¶ 43. However, we agree with defendants that following Garret's breach of the fiduciary duty of loyalty, he was no longer entitled to reimbursement for his unpaid compensation. "It is one of the fundamental principles of agency that an agent guilty of misconduct and fraud in relation to the transaction of the principal's business is not entitled to compensation for his or her services." 5A Fletcher Cyclopedia, supra, § 2145. This means that "[a] corporate officer is not entitled to compensation for services during a period in which that officer engages in activities constituting a breach of the duty of loyalty to the corporation." Id.; see Restatement (Third) of Agency § 8.01 cmt. d(2) (2006). Thus, we have previously held that a real estate broker was not entitled to commission on the sale of property where it had breached its duty of loyalty to the seller. Quechee Lakes Rental Corp. v. Boggess, 158 Vt. 258, 263-64, 608 A.2d 39, 42 (1992) (citing Restatement (Second) of Agency § 469 (1958) for rule that "[a]n agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty"). Applying the same principle, numerous other courts have withheld compensation owed to a corporate officer based on a breach of the fiduciary duty of loyalty. See, e.g., Slosberg v. Callahan Oil Co., 7 A.2d 853, 855 (Conn. 1939); Metro Storage Int'l LLC v. Harron, 275 A.3d 810, 863 (Del. Ch. 2022); Dowd & Dowd, Ltd. v. Gleason, 816 N.E.2d 754, 771 (Ill. App. Ct. 2004); Chelsea Indus., Inc. v. Gaffney, 449 N.E.2d 320, 327 (Mass. 1983); Zakibe v. Ahrens & McCarron, Inc., 28 S.W.3d 373, 385 (Mo. Ct. App. 2000); Am. Timber & Trading Co. v. Niedermeyer, 558 P.2d 1211, 1223 (Or. 1976).

¶ 44. We conclude that the trial court erred in awarding compensation to Garret during the periods in which it also found that he had breached his duty of loyalty to the company. The court found that Garret breached his duty of loyalty to Brothers LLC by assuming complete control over the amounts billed by and paid to his personal corporations and by actively preventing the

other LLC members from accessing financial records. The court noted that following Garret's ouster, Brothers LLC considerably reduced management expenses and was able to hire an in-house bookkeeper for $50,000 per year less than the cost of MSI's bookkeeping services. The court also found that Garret's refusal to return the financial records "frustrated the ability of the members to understand the finances of the business in order to manage it responsibly," thereby prolonging the company's financial problems. Under these circumstances, we cannot agree that Garret was entitled to receive compensation despite his multiple breaches of fiduciary duty. Prior to March 2020, Garret was entitled to compensation because the majority members acquiesced to his actions. However, beginning in March 2020, Garret forfeited his right to compensation by engaging in self-dealing transactions without authorization and to the detriment of the business, and by actively resisting efforts to curb his complete control over the company's finances. The court erred in failing to consider Garret's breach of fiduciary duties in assessing his entitlement to compensation. Accordingly, we reverse and remand on this issue for a calculation and reduction in the amount of compensation due.

The court order requiring reimbursement for Garret's unpaid compensation after March 2020 is reversed and remanded for entry of judgment in defendants' favor; in all other respects, the order is affirmed.

FOR THE COURT:

_____

Chief Justice

23